# Illinois Official Reports

## Appellate Court

---

### *People v. Watkins*, 2015 IL App (3d) 120882

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES WATKINS, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0882 |
| Filed | January 21, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for unlawful possession of a controlled substance with intent to deliver, the appellate court rejected defendant's contention that the trial court erred in admitting at trial defendant's prior conviction for unlawful possession of cannabis with intent to deliver as other-crimes evidence that defendant intended to deliver the controlled substance in the instant case, but his conviction was reversed and the cause was remanded for a new trial based on the admission of photographs of two sets of drug-related text-message conversations containing defendant's name that were found on a cell phone near the drugs that were discovered in the course of executing a search warrant, since there was no evidence to properly authenticate the text messages as being sent to defendant or cell phone records showing that the cell phone belonged to or had been used by defendant; furthermore, the erroneous admission of the text messages was not harmless error. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 12-CF-95; the Hon. Stephen Kouri, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Michael J. Pelletier and Sharifa Rahmany (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

Jerry Brady, State's Attorney, of Peoria (Justin A. Nicolosi (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice Wright specially concurred, with opinion.

**OPINION**

¶ 1   After a jury trial, defendant, Charles Watkins, was convicted of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2012)) and was sentenced to eight years in prison. Defendant appeals his conviction, arguing that the trial court erred in admitting at trial: (1) evidence that defendant had previously been convicted of unlawful possession of cannabis with intent to deliver as other-crimes evidence of defendant's intent to deliver the controlled substance in the present case; and (2) photographs of two sets of drug-related text-message conversations containing the name "Charles" that were found on a cell phone in close proximity to the drugs in the present case as evidence that defendant had a connection to the cell phone and, circumstantially, to the drugs. We affirm the trial court's ruling as to the other-crimes evidence and reverse the trial court's ruling as to the text messages. In addition, because we find that the erroneous admission of the text messages in this case was not harmless error, we reverse defendant's conviction and remand this case for a new trial.

¶ 2                                    I. FACTS
¶ 3   On about January 26, 2012, defendant was arrested and charged with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2012)) and with unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(A) (West 2012)). During the pretrial stage of the case, the State filed a notice of its intent to offer into evidence several of defendant's prior drug convictions as proof of defendant's intent to deliver the substance in the present case and for any other issue for which the evidence might become relevant during the trial. The convictions the State sought to admit were: No. 10 CF 191 (unlawful possession of cannabis), No. 10 CF 1213 (unlawful possession of a controlled substance), No. 10 CM 2102 (unlawful possession of cannabis), No. 09 CF 289 (manufacture

or delivery of cannabis)[1], No. 07 CM 2324 (unlawful possession of cannabis), and No. 06 CM 2046 (unlawful possession of cannabis).

¶ 4    The trial court treated the notice as a motion *in limine* and held a hearing on the matter prior to trial. At the hearing, the State argued that it was seeking to admit the convictions not to show defendant's propensity to commit crime but to prove defendant's intent to deliver the substance, to prove defendant's knowledge or absence of mistake about the substance, and to prove defendant's general familiarity with drugs. The State discussed some of the different factors the trial court was to consider in deciding whether to admit the evidence. The first such factor, according to the State, was whether there were sufficient facts to prove the other crimes. The State asserted that the sufficiency of the evidence of the other crimes was not a concern in this case because the defendant had actually been convicted of the other offenses and because the State was seeking to admit the actual convictions and not just the underlying facts of the offenses. As for the closeness in time and the similarity between the current offense and the prior offenses, the State asserted that all of the cases were within the past six years and that the fact that different drugs may have been involved did not make the current offenses and the prior offenses dissimilar. Regarding the probative nature of the evidence, the State described the circumstances of the instant case (that it involved constructive possession of drugs found in a common area) and asserted that the defendant would likely try to distance himself from the drugs and would likely argue that he had no knowledge of the drugs and was not in possession of them. Citing *United States v. Perkins*, 548 F.3d 510 (7th Cir. 2008), the State asserted further that the other-crimes evidence should be admitted for that exact reason–because it showed that defendant was not somebody who had one isolated incident where he was caught in the same room with drugs or in the same area with drugs but, rather, that defendant had a series of encounters with drugs over the past several years. The State noted that as to the possession with intent to deliver charge, it was the State's burden to prove intent and that the other-crimes evidence should be admitted for that purpose. Finally, with regard to prejudice, the State asserted that any prejudicial impact could be minimized by instructing the jury that the evidence could only be considered by it for the limited purposes specified.

¶ 5    Defendant opposed the motion and asked the trial court to exclude the other-crimes evidence. Defendant asserted that the danger of unfair prejudice to defendant substantially outweighed the probative value of the other-crimes evidence. Defendant claimed that any jury instruction given by the trial court as to the limited nature of the evidence would "go right over [the jurors'] heads" and would not be understood by the jury. According to defendant, the other-crimes evidence would ultimately be considered by the jury as evidence of defendant's propensity to commit the crime charged–that because defendant had been convicted of drug crimes in the past, he must have been the person who was in possession of the drugs in the present case. Defendant noted that several of the prior crimes involved a different drug (cannabis) than defendant was charged with in the present case (cocaine). Regarding the sufficiency of the evidence to prove that defendant had committed the other crimes, defendant asserted that he was not challenging that factor because the State had prior convictions to establish that the other crimes had been committed by defendant.

---

[1]The State later informed the trial court that the defendant was actually convicted of unlawful possession of cannabis with intent to deliver in that particular case.

- 3 -

¶ 6        At the conclusion of the hearing on the motion *in limine*, the trial court took the motion under advisement. The trial court later granted the State's motion, in part, ruling that it would allow the State to admit as evidence of defendant's intent to deliver in the instant case defendant's prior conviction for manufacture or delivery of cannabis.[2] In so doing, the trial court stated that it was relying in major part upon the decision in *People v. Walker*, 194 Ill. App. 3d 864 (1990). The State informed the trial court that it would be presenting the evidence in the form of a certified copy of conviction and that it would prepare for the trial court a jury instruction that the trial court was supposed to read to the jury before the evidence was presented and that was also to be made part of the jury-instruction packet.

¶ 7        In addition to the above, on the date of the hearing on the motion *in limine*, defense counsel informed the trial court that he had just received some late discovery from the State. The discovery indicated that one of the police officers in the case had recovered several hundred text messages from one of the cell phones that was found in the same drawer as the drugs during the execution of the search warrant and that as an expert witness, the officer was going to opine that the text messages demonstrated an intent to distribute drugs. Defendant asked that the text messages be excluded because they had not been turned over until just before the trial. The trial court denied that request and instead continued the trial for a few days to allow defense counsel to review the text messages and to further prepare for trial.

¶ 8        The jury trial in this case was held in August 2012. During opening statements, the prosecutor told the jury that the evidence would show that defendant was a "drug dealer" and that on the date in question, defendant was caught with almost 50 grams of powder cocaine and $5,000 in cash. Defense counsel told the jury in his opening statement that the prosecution had the burden of proof and that it would not be able to prove its case against defendant because the evidence simply was not there. Defense counsel asserted that the evidence would not show to whom the drugs belonged–that a lot of people came and went from the residence, that defendant was just visiting at the time the drugs were found, that the drugs were not found anywhere near the defendant, and that defendant's fingerprints were not found on any of the items recovered. Although the prosecution did not mention anything about a cell phone or text messages in its opening statement, defense counsel told the jury in his opening statement that it might eventually hear some evidence that the State would present about a cell phone and certain text messages on the cell phone. Defense counsel commented that there would be no evidence connecting that cell phone to defendant–no identifying marks on the phone, no name on the phone, no fingerprints, and no phone number associated with the phone. Transitioning away from the cell phone and back into the lack of evidence, defense counsel commented further that there would be "no testimony from any direct eyewitness taking the stand claiming that [defendant] at any point possessed drugs that were found in that residence, let alone that he possessed with any type of intent to deliver drugs."

¶ 9        After the opening statements had concluded, the trial moved into the evidence phase. The evidence presented at the trial, relevant to the issues raised in this appeal, can be summarized as follows. On January 26, 2012, several police officers executed a search warrant at the residence at 608 East Thrush in Peoria, Illinois. The officers proceeded to the residence at about 6:30 p.m. that evening to conduct surveillance before they executed the search warrant.

---

[2]As noted above, the trial court was later informed by the State that defendant's conviction in that particular case was actually for unlawful possession of cannabis with intent to deliver.

During their surveillance, the officers saw several vehicles coming and going from the alley behind the residence.

¶ 10 The officers executed the search warrant at about 8 or 8:30 p.m. Although the officers knocked on the front door and announced their presence and their purpose for being there, no one answered the front door, so the officers used a ramming device to gain entry. As some of the officers were entering the residence, another officer stationed outside saw a person in the southeast bedroom attempt to open the bedroom window. When the officer outside shined a flashlight on the window, the person who was trying to open the window withdrew from it, as commands were being given from the officers inside the residence. Prior to or during the execution of the search warrant, the officers noticed that a surveillance camera was mounted on the front of the residence and that it was focused on the front porch area. The surveillance camera was visible on or near the TV screen, so that if someone was in the living room area, he or she could see individuals at the front door. A police scanner was also located inside the residence.

¶ 11 Upon searching the residence, officers found in plain view in an open drawer in the kitchen one bag containing 47.3 grams of powder cocaine, two bags containing a total 13.4 grams of cannabis, two scales with suspected cocaine residue, three cell phones,[3] a spoon with suspected cocaine residue, and an empty plastic baggie with suspected cocaine residue. On the kitchen counter, the police found plastic baggies with the corners torn off and a blunt (a cannabis-filled cigar). Inside a light-colored purse on the kitchen table, the police found a scale and two measuring cups with suspected cocaine residue. Although fingerprint analysis was later conducted on many of the items found in the kitchen drawer, no fingerprints were obtained.

¶ 12 Defendant and about five other people were present in the residence when the police began executing the search warrant. Another person, Gwen Evans, the tenant of the residence, showed up later. Defendant was the only person at the residence that evening with the first name of "Charles." Defendant was found lying on the bed in the southeast bedroom of the residence and was the only person in that room. Defendant had $577 in his front pocket, which consisted mostly of $20 bills. An additional $4,566, which included 150 $20 bills, was found under the mattress in the same bedroom where defendant was located. Defendant's state identification card, showing a different residential address for defendant, was found on top of the china cabinet in the living room. No drugs or drug paraphernalia were found on defendant's person, and no mail, photographs of defendant, or bills of defendant were found in the southeast bedroom.

¶ 13 Another subject, Anthony Parker, was located in the living room/dining room of the residence, which was just off of the kitchen, and was found to have eight individually wrapped packages of suspected crack cocaine, a bag of suspected cannabis, a folding knife, and a cell phone on his person. The officer who was in charge of executing the search warrant that evening, Officer Brad Dixon, stated during his testimony that he had no indication that Parker was staying at the residence or that Parker would be at the residence when the search warrant was executed.

---

[3]It appeared from the testimony that one of the three cell phones may have been located on a shelf near the drawer, rather than in the drawer itself.

¶ 14     Defendant was cooperative with the police during the search and did not attempt to run or to resist. Defendant gave a statement at the police station after being read his rights and denied any knowledge or ownership of the drugs in the house. Defendant told police that the lease for the residence was in the name of his aunt, Gwen Evans; that he had been staying there for the past two or three weeks; and that he would sleep on a pull-out couch in the front living room of the residence. Defendant stated that the $577 on his person was his son's social security money and denied that he had any knowledge of the money under the mattress in the southeast bedroom.

¶ 15     During the trial, expert witness testimony was presented from Officer Dixon that: (1) the powder cocaine found in the kitchen of the residence was a "fairly substantial" amount that would not be for personal use and was, instead, for distribution; (2) the eight individually packaged pieces of crack cocaine found on Anthony Parker were packaged for sale; (3) drug dealers in the area typically sold 0.2 gram packages of crack cocaine for $20; (4) it was common for drug dealers in the area to deal in multiple types of drugs; (5) drug dealers did not use banks and would typically keep their money hidden somewhere either on them or very close to them in their residence; and (6) in a house such as the one in the present case, a large amount of $20 bills would indicate that the person was selling $20 pieces of crack cocaine.

¶ 16     Officer Dixon also provided additional testimony about the three phones that were recovered from the same kitchen drawer as the cocaine. The phones were admitted into evidence at defendant's trial. Dixon testified that the phones were sent for forensic analysis, but the machine that analyzed the phones was unable to extract any information from them. At some point later (prior to the trial), at the request of the prosecutor, Dixon turned on the cell phones and was able to retrieve hundreds of text messages from one of the cell phones, which he opined were mostly drug-related. Dixon photographed the text messages that were on that cell phone; did not alter, delete, or change the text messages; and testified that the photographs accurately depicted the text messages that were on the cell phone.

¶ 17     When the State sought to admit a sample of those text messages as evidence of identity (defendant's connection to the cell phone) and intent to deliver, defendant objected on the grounds of relevancy, foundation (no evidence that connected the phone to defendant), and hearsay. The matter was discussed outside the presence of the jury between the trial court and the attorneys. The trial court found that the text messages were relevant to show that the phone was part of a drug-dealing enterprise. The trial court commented that it was "very sensitive" to defense counsel's argument that the cell phone was not connected to defendant. The trial court ruled, therefore, that the State could introduce the text messages that contained the name "Charles" and that were related to tying the cell phone to defendant and drug dealing.

¶ 18     When the State argued that Officer Dixon should be allowed to testify about the other messages, even if they were not being admitted as substantive evidence, because they were part of the basis for his expert opinion, the following conversation ensued:

     "THE COURT: I understand, but I think you're saying we're not offering if for the truth of the matter asserted, but I don't think any limiting instruction is going to stop this jury once you start piling 30 messages in front of them about drug dealing is going to pay that much attention to a limiting instruction. It's going to be taken for the truth of the matter asserted, and I'm just not going to allow it. If you want to tie–the officer has testified I've seen hundreds of messages on this phone, they relate to drug dealing, I'm

going to let you tie the phone to him. Are you saying that there aren't messages in there that use his name?

[THE PROSECUTOR]: No. There are. That's what I'm going to go through, but I think there are other messages. There were some that specifically deal with 608 East Thrush. Again, I think that goes to who was located here.

THE COURT: Well, that's also the truth of the matter asserted, and I'm just not going to allow it.

[THE PROSECUTOR]: What about the ones referring to when they–when I get to it, I will read it.

(Pause.)

[THE PROSECUTOR]: There is one that refers to–the specific message is, 'I need a half altogether but I got 350. Did Gwen tell you about it?' Again, there's been evidence that the leaseholder, the defendant's aunt, this was his statement to the police is Gwen. So, again, I think that circumstantially links the defendant to this phone, and the phone is linked to the drugs. And, again, there are arguments, you know, the defendant–the defense attorney, obviously, Officer Dixon is subject to cross-examination on this and he can point that out, but if it's a link that establishes that, like if that specific one, Gwen, that's one I would ask for admission as well.

THE COURT: I may be the slowest person in the courtroom, but that sounds to me like that actually helps the defendant but–as to it might be somebody else dealing drugs, but I appreciate where you're coming from. I just think when you start to pile all these up, it changes what it really is.

[THE PROSECUTOR]: That's why we chose a random 20, not hundreds.

THE COURT: I understand. I mean, I don't want to unduly tie your hands either. I want to be fair to both, to all parties here, but I don't know which ones deal with–I don't know what the I'll call them the Charles texts. I don't know what they say. I don't know, you know, I think you are allowed to tie that phone into drug dealing, why the officer has made that opinion, and then also tie the phone to Charles, whoever Charles is, but–and the defense can argue, well, there's another Charles out there. But I don't know–you know, somebody said there's, what, five texts with Charles in it?

[THE PROSECUTOR]: I pulled them out. They're–it's five separate days. It's not like one text message. It's text messaging going back and forth between the person ordering and Charles responding, so I would say that it's five separate days.

THE COURT: You want to put it all in context and everything, and I understand that, but then all of a sudden it changes the character of how that evidence is really being heard. That's all I'm telling you."

¶ 19    At that point, the trial court was shown the text messages in question. The messages were grouped by date first and then by conversation. The prosecutor explained to the trial court that in the photographs, the text messages with the bubble pointing to the right were outgoing text messages that were sent from the cell phone in question and that the text messages with the bubble pointing to the left were incoming text messages that the cell phone in question had

received. The trial court ruled that the State could admit and publish two of the text-message conversations.[4]

¶ 20       When the trial court commented to the attorneys that it was going to give a limiting instruction to the jury that it could consider the text messages for the purpose of determining whether the phone was connected to defendant, but it could not consider the text messages for the purpose of determining whether there was a drug transaction occurring that was being talked about in the text messages, the following conversation ensued:

"[THE PROSECUTOR]: I agree with that instruction with regards to identity, but that misses the second purpose of this which is we have to prove those drugs were for distribution. And in that case, it does come in as intent to distribute. It's no different than our prior comes in as intent to distribute, so you do get to use the prior.

THE COURT: Well, I'm talking about these specific messages that you're going to show. He's already testified that there's hundreds of messages on there that are drug related. That is in evidence. I'm talking about–and that's a general statement. He doesn't verbatim talk about any specific message when he says that, and the defense didn't object to that testimony in any event; and it is an opinion he's giving based on hearsay information. But I'm not going to let you put that hearsay information in front of the jury for that purpose. I'm just not.

[THE PROSECUTOR]: For intent?

THE COURT: Right. He's testified that this phone is being used for drug purposes. He's testified to that. That's the way I understood it or at least an inference that can be drawn, so that part of the evidence is in front of the jury. I'm not going to–and he has said that based on a generic review of those messages. He hasn't quoted any message yet to the jury and I don't want him to, but I'm going to let you put on specific messages that connect the phone potentially or at least as evidence of the phone being connected to this defendant. I'm going to let you do that, but I'm going to instruct the jury that it's for that limited purpose. But I'm not saying that you can't argue in front of the jury that this phone wasn't used for drugs. That's in evidence. I just don't know why you need to now put the specific hearsay messages for that purpose in front of the jury. You've got his opinion. You've got the basis of his opinion on this point of the phone. Why do you need to put the hearsay information in front of the jury on that point?

[THE PROSECUTOR]: My review of the case law is I don't think it's hearsay. I mean, I understand your ruling. I'm fine with that. My position is it's not hearsay.

THE COURT: I think it is. I think it's clearly hearsay, and, you know, when you start to put it in front of them in volume, it loses this–I mean, it becomes offered for the truth of the matter asserted.

[THE PROSECUTOR]: And that's why I limit it, but I don't see how this, how a text message is any different to the address book located in [*People v. Reed*, 108 Ill. App. 3d 984 (1982)]. In the address book it had named other individuals and phone numbers, and the address book came in.

---

[4]Although not quite clear from the record, it appears that there were about five sets of text-message conversations that the State was seeking to admit.

THE COURT: But they were only zeroed in on the name. They specifically say in the case nobody is trying to say that that's an accurate phone number or not.

[THE PROSECUTOR]: Right, but my point is the whole address book came in. In other words, the entire message should come in, but it comes in because it's identity to the defendant.

THE COURT: I know. I just think it's being offered for the matter asserted. You're not limiting really the context of that message. Your just not. You want the drug transaction in. You want it in, and you want them to think it's a drug transaction.

[THE PROSECUTOR]: But we would be able to if–I could establish that through–and that's the other crimes evidence. You can bring in other crimes for intent.

THE COURT: I understand. That's my ruling. I think you're being pretty aggressive. I'd just like to try this case once, not twice and maybe you're right. So let's bring the jury back in."

¶ 21    When the jury was brought back in, Dixon was shown the group exhibit containing the photographs of the text messages at issue. Dixon testified that exhibit contained accurate photographs of messages on the cell phone that named or identified a person. The State moved to admit and publish the group exhibit. The trial court granted that request and instructed the jury as follows:

"I'm going to admit [the group exhibit]. That long break was dealing with the defense's objection. I'm admitting it over the defense's objection. I'm going to allow you folks to see it. Now, what it purports to be–well, you draw your own conclusions as to what it purports to be, but I'm only offering it for the limited purpose for you to consider whether or not there is some evidence that this phone is connected to this defendant.

Now, that doesn't–to the extent you might construe these messages to mean there was a drug dealing going on with this message, an actual transaction, that's not for you to consider whether or not that transaction happened, whether or not that's evidence of a transaction. You're only to consider at least this part of the evidence, this exhibit as to whether or not this phone, whether or not it's evidence of a phone connected to this defendant.

Now, there may be other evidence in the case and there may not be. That's up to you to connect whether or not there was drug dealing going on, but for purposes of this bit of the evidence, this exhibit, you're only to consider it for this limited purpose."

¶ 22    Officer Dixon was then allowed to testify about some of the text-message conversations as the jury was apparently viewing the photographs. Dixon was shown the photographs of the first series of text messages and confirmed that the photographs were of the actual face of the cell phone. Dixon stated that the first set of text messages was a sample or a portion of a series of messages that were sent to the cell phone in question from a person identified on that cell phone as "Angela." According to Dixon, the first message in the series from Angela stated, "C dis da shit I'm talking about. I got people waiting on you and you always be on B.S. I'm tryin to bring you some money and they don't have all day waiting. Why you playin?"[5] The next

_____

[5]Our quotation of the text-message conversations is from the trial court transcript of Officer Dixon's testimony. The language used in the actual text messages was abbreviated at times and,

message from Angela on the cell phone stated, "A Vik and a." Dixon testified that the phrase "a Vik" typically referred to a Vicodin pill. The following message to the cell phone from Angela stated, "Altogether I want a half Vik ball and separate please and I want it all done. And I got all your money too." Dixon testified that the "half Vik" referred to half of a Vicodin pill and the "ball" referred to could be an eighth of an ounce of cocaine or what was known as an "8 ball." According to Dixon, the next message, the first part of which was partially blocked, said, "Sam something 10 minutes and it's been half hour. What up Charles." The next message from Angela to the cell phone in question said, "Charles really? So how much longer?" The text continued further on, stating, "What I'm saying is where you at so I can come to you while I got their money? They tried [*sic*] of waiting. What you want me to do? And don't fuck'n ignore me either." The message after that stated, "They gonna leave in the next 10 minutes. I can't keep them here longer. You got me and my people waiting. Damn. What's going on?" That was the end of the first series of text messages.

¶ 23     Dixon was then shown the photographs of the second series of text messages to the cell phone in question from Angela. Dixon again confirmed that the photographs were of the actual face of the cell phone. According to Dixon, the first message of the second series stated, "I need my usually and someone needs a ball." Those same messages were then repeated. The next message stated:

> "See Charles dis shit be crazy how you be playing me. When can I come get it myself? Can I just go and wait on you Cuz? I'm at your crib. Man, I got a lot of complaints on this. You put a lot of soda on this shit. You bogus. I can't wait to tell you–I can't wait to tell OJ how you been playing me."

Dixon commented that the "soda" reference was to baking soda, which was what crack cocaine was cut or made with, and that the more baking soda that was added to increase the quantity of the substance, the more that the quality of the crack cocaine would be reduced. The message after that stated, "Well, I don't want dis B.S. I want my money back." A message was then sent out from the cell phone that stated, "I'm going to come and get that so I can do it up better for you. My bad. Tell me what you got left." The person identified as Angela responded to that message with:

> "You just fucked me. Why Charles only person I fuck with is you and dis how you playing me. I even send some of my people to you. All of it. No. You and I don't know why you keep lying to me on some B.S. I'm not the one who be playing you at all. I do you right at all times and keep it real with you."

At that point, another outgoing message was sent to Angela from the cell phone in question, stating, "I did it too fast. I got you." Angela responded, stating, "Whatever. I know you lying to me, Charles. I just don't[–]." At that point, the message was cut off. That was the end of the second series of text messages.

¶ 24     During cross-examination, Dixon acknowledged that he did not know the phone number of the cell phone in question, that there was no indication on the phone itself or on the screen of the phone as to who was the owner of the cell phone, and that there were two other cell phones

---

therefore, slightly different from what is contained in the transcript of Officer Dixon's testimony. Neither side has disputed or challenged Dixon's reading of the text messages as contained in the transcript.

recovered from the drawer or drawer area during the execution of the search warrant, although one of the cell phones was later discovered to be a fake or non-functioning cell phone.

¶ 25 As its final piece of evidence in its case-in-chief, the State was allowed to admit evidence of defendant's prior conviction for unlawful possession of cannabis with intent to deliver. The evidence was admitted, over defendant's objection, on the issue of defendant's intent to deliver the cocaine in the instant case. The evidence was presented in the form of a certified conviction, which the trial court read to the jury. Prior to reading the certified conviction to the jury, the trial court instructed the jury that the evidence that the defendant had been involved in another crime could only be considered by them on the issue of intent. As read to the jury by the trial court, the certified conviction stated that defendant had been convicted in Tazewell County case number 09 CF 289 for the charge of unlawful possession of cannabis with the intent to deliver and that the conviction was entered on September 25, 2009.

¶ 26 After the State rested, defendant elected not to testify in his case-in-chief. Instead, defendant presented the testimony of his sister, LaTonya Ross. Ross testified that defendant did not live at the residence on Thrush but would visit there because their aunt, who lived at the residence, was helping to care for defendant's son or for the mother of defendant's son. According to Ross, several people would come and go from the residence. On two occasions that Ross visited the residence, a man named Charles, who their aunt dated or was friends with, was present at the residence. Ross did not know whether the Charles that her aunt was dating was staying at the residence, where the man lived, or the man's last name. Ross stated further that in the weeks leading up to the execution of the search warrant defendant was living at 1708 West Garden Street. Ross acknowledged during her testimony that she had previously been convicted of felony retail theft in both 2006 and 2007.

¶ 27 After all of the evidence had been presented, the attorneys made their closing arguments. In the summation portion of the State's closing argument, the prosecutor referred to defendant several times as a "drug dealer." In addition, in discussing whether the State had proved that defendant had the intent to deliver the cocaine in this case, the prosecutor stated the following about the text messages:

"Finally, additional identity evidence. We've got the cell phone, those text messages. Two sets of text messages were entered into evidence. That cell phone–it's from the cell phone that was recovered in the immediate area of the drugs and the drug equipment that was found in the kitchen. The content of those text messages contained the word 'Charles.' Those text messages were solicitations, people seeking to buy drugs–not solicitations, but people seeking to buy drugs from a person named Charles. Draw your own conclusions there. What are the chances that it's some other Charles who happened to be a resident at 608 East Thrush Street? Just–the chances of that are astronomically low. So I'd submit to you that the evidence not only establishes that drug dealing was going on, but it's also quite clear on exactly who that drug dealer was, sitting right there."

¶ 28 The prosecutor also made the following comments about defendant's prior conviction:

"Now, that's a lot of language for a word that doesn't seem too complicated, the word 'deliver.' What I'd bring to your attention here is that it's not our burden to prove that delivery occurred. We don't have to prove that. We just have to prove intent to deliver, and that intent to deliver–that intent to deliver is pretty unambiguous based on the evidence. That goes back to–that goes back to the amount of cocaine that was

found. Officer Dixon testified almost $5,000 if you do the math. Officer Dixon testified that that's not an amount based on his experience he would see for personal use. All of the drug items that were found in association with the cocaine–the measuring cups, the spoon, the scales–that all goes to intent to deliver. Clearly an intent to deliver exists.

In addition to that, one more thing to consider is the Defendant's drug prior, which was admitted into evidence. The Defendant was convicted of unlawful possession of cannabis with intent to deliver. That goes to the Defendant's intent to deliver drugs. That makes it more likely that he intended to deliver this cocaine."

¶ 29    When closing arguments were finished, the jury was instructed on the law. As part of those instructions the jury was again informed that evidence that defendant had committed another crime could only be considered by it on the issue of defendant's intent. The jury was also instructed that any evidence that was admitted for a limited purpose could not be considered by the jury for any other purpose. At the conclusion of deliberations, the jury found defendant guilty of both possession of a controlled substance with intent to deliver and possession of a controlled substance. Defendant filed a posttrial motion, raising, among other things, the errors raised in this appeal. The trial court denied the posttrial motion and subsequently sentenced defendant to eight years in prison on the intent to deliver charge. No judgment or sentence was entered on the simple possession charge. This appeal followed.

¶ 30                                   II. ANALYSIS
¶ 31                    A. Admissibility of Photographed Text Messages
¶ 32    On appeal, defendant challenges both the admissibility of the other-crimes evidence and the admissibility of the text messages. We will address the admissibility of the text messages first because that issue is dispositive of this case on appeal. As to that issue, defendant argues that the trial court erred in admitting into evidence photographs and testimony of the two text-message conversations that were contained on one of the phones that was found in the kitchen drawer where the drugs were located. Defendant asserts first that the admission of the text-message conversations was erroneous because the State failed to present a proper foundation to authenticate the text messages as was required for admission. In making that assertion, defendant notes that the State presented no evidence that defendant owned or used the phone from which the messages were recovered; no testimony from the sender or receiver of the messages as to who authored the messages; no phone records connecting defendant to the phone; and no testimony from an expert witness, who had analyzed the phone, who could testify as to the integrity and genuineness of the messages. In fact, according to defendant, the only witness who testified about the messages, Officer Dixon, had no personal knowledge as to who had authored the messages. Defendant asserts further that because the State failed to present a witness with personal knowledge of the messages, defendant was unable to cross-examine the declarant to expose any unreliability in the content of the messages.

¶ 33    Second, defendant asserts that admission of the text messages was erroneous because the content of the messages themselves was inadmissible hearsay and was used impermissibly by the State for the truth of the matters asserted–to show that defendant was dealing drugs. According to defendant, the record shows that the trial court recognized the potential hearsay problem with the messages but still allowed two entire text-message conversations to be admitted. Defendant asserts that if the true purpose for admission of the text messages was to link defendant to the phone and, by implication, to the drugs located in the same kitchen

- 12 -

drawer as the phone, then the trial court should have only admitted the individual text messages that contained the name "Charles," and not the highly prejudicial text messages that contained references to drugs. Defendant asserts further that the error that occurred was highly prejudicial and far from harmless and was compounded when the prosecutor cited the content of the text messages in closing argument and argued to the jury that the content of the messages showed that defendant was engaged in drug dealing. In addition, defendant asserts that the limiting instruction that was given by the trial court was confusing and inaccurate and did not serve to cure the error from the erroneous admission of the text messages but, instead, made the error worse. Based on the erroneous admission of the text messages, defendant asks that we reverse his conviction and that we remand this case for a new trial.

¶ 34     The State argues that the trial court's ruling on the admissibility of the text messages was proper and should be affirmed. The State asserts first that it authenticated exactly as much of the text messages that it needed to authenticate to establish that the phone was what the State (the proponent) claimed it was, a phone that had been used by defendant and was connected to defendant. Thus, the State contends that it presented an adequate foundation for the admission of the text messages and that defendant's argument to the contrary should be rejected. In making that contention, the State points out that the trial court only allowed the State to admit a small sampling of the text messages, ones that contained the name "Charles," and only for the purpose of attempting to connect defendant to the cell phone that was found in the same drawer where the drugs were located. According to the State, it did not need to present the testimony of the sender and/or receiver of the text messages because the substance of the text messages was not at issue–the messages were not being admitted for the truth of the matters asserted but only to establish that defendant owned or had used that particular cell phone. The State contends further that there was no question about the accuracy of the messages because photographs of the actual messages were presented and were established to be true and correct depictions of the messages on the phone.

¶ 35     A determination of the admissibility of evidence is in the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12; *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Under the abuse of discretion standard, "[t]he reviewing court owes some deference to the trial court's ability to evaluate the impact of the evidence on the jury." *People v. Donoho*, 204 Ill. 2d 159, 186 (2003). The threshold for finding an abuse of discretion, therefore, is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *Donoho*, 204 Ill. 2d at 182. Reasonable minds can disagree about whether certain evidence is admissible without requiring a reversal of a trial court's evidentiary ruling under the abuse of discretion standard. See *Donoho*, 204 Ill. 2d at 186.

¶ 36     For the purpose of establishing a proper foundation for admissibility, text messages are treated like any other form of documentary evidence. See *People v. Chromik*, 408 Ill. App. 3d 1028, 1046-47 (2011). A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated. *Id*. at 1046; see also Michael H. Graham, Graham's Handbook of Illinois Evidence § 901.0, at 1034-37 (10th ed. 2010). To authenticate a document, the proponent must present evidence to demonstrate that the document is what the proponent claims it to be. Ill. R. Evid. 901(a) (eff. Jan. 1, 2011); *Chromik*, 408 Ill. App. 3d at 1046. The proponent need only prove a rational basis upon which

the fact finder may conclude that the document did in fact belong to or was authored by the party alleged. See *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005). The trial court, serving a limited screening function, must then determine whether the evidence of authentication, viewed in the light most favorable to the proponent, is sufficient for a reasonable juror to conclude that authentication of the particular item of evidence is more probably true than not. 1 Kenneth S. Broun, McCormick on Evidence § 53 (7th ed. 2013); Graham, *supra*, § 104.2, at 64-65; see also Ill. R. Evid. 104(b) (eff. Jan. 1, 2011). If so, the trial court should allow the evidence to be admitted. *Id*. The trial court's finding of authentication in that regard is "merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *Downin*, 357 Ill. App. 3d at 202-03. If the trial court, after serving its screening function, allows the evidence to be admitted, the issue of authorship of the document is then ultimately up to the jury to determine. *Id*. at 203; McCormick, *supra*, § 53; Graham, *supra*, § 104.2, at 64-65.

¶ 37        Documentary evidence, such as a text message, may be authenticated by either direct or circumstantial evidence. *Downin*, 357 Ill. App. 3d at 203; see also Ill. R. Evid. 901(b) (eff. Jan. 1, 2011). Circumstantial evidence of authenticity includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be taken into consideration with the surrounding circumstances. See *Downin*, 357 Ill. App. 3d at 203; Graham, *supra* § 901.4, at 1051-52. Documentary evidence, therefore, may be authenticated by its contents if it is shown to contain information that would only be known by the alleged author of the document or, at the very least, by a small group of people including the alleged author. See *id*.

¶ 38        In the present case, the text messages were admitted for a limited purpose, to show that defendant had used the cell phone found in the drawer, and therefore, by implication, that there was a connection between defendant and the drugs found in the drawer. The only evidence presented by the State to authenticate the text messages was the fact that the cell phone was found in the same house as defendant, albeit in a drawer in a common area, and the fact that some of the messages referred to, or were directed at, a person named "Charles." In our opinion, that evidence was not sufficient to properly authenticate the text messages as being sent to defendant. As defendant pointed out in part, there were no cell phone records to indicate that the cell phone belonged to or had been used by defendant or anyone else at the residence; there was no eyewitness testimony to indicate that the cell phone belonged to or had been used by defendant or that the messages were being sent to defendant; and there were no identifying marks on the cell phone itself or on the cell phone's display screen to indicate that the cell phone belonged to or had been used by defendant (other than possibly the references to "Charles" in the text messages). The fact that photographs of the actual screen of the cell phone were presented and that Officer Dixon testified that the photographs were true and accurate does not change our opinion on this issue. Dixon's testimony was not sufficient to authenticate the text messages because Dixon had no personal knowledge of the text messages and had no idea who was the owner or user of the cell phone. See *People v. Pulliam*, 176 Ill. 2d 261, 276-77 (1997) (in a prosecution for first-degree murder, aggravated criminal sexual assault, aggravated kidnapping, and aggravated unlawful restraint committed against a six-year-old child, the cover of a book found by the police in the defendant's unlocked apartment two days after the crimes were committed entitled, "The Force of Sex," was not shown to be relevant

and should not have been admitted by the trial court at the defendant's trial where there was no testimony as to the contents of the book or that the defendant had owned or had read the book). Thus, we conclude that a proper foundation had not been laid for the admissibility of the text messages and that the trial court committed an abuse of discretion by erroneously admitting the text messages over defendant's objection. *Cf. Chromik*, 408 Ill. App. 3d at 1046-48 (in a sex-offense case, a transcription of text messages that were allegedly sent from the defendant to the victim was properly authenticated where the dates and times of the messages as contained in the transcription mirrored those contained in the phone company's records, the victim testified as to the content of the messages, and the defendant acknowledged the accuracy of several of the messages); *Downin*, 357 Ill. App. 3d at 202-04 (in a sex-offense case, copies of email letters allegedly sent from the defendant to the victim were properly authenticated where the victim testified that she met the defendant on the Internet, that she and the defendant communicated by email, that she had received a reply to the letter she had sent at the investigating officer's direction to the email address she knew from prior email contacts to be the defendant's, and that the email response that she had received was responsive to the email she had sent and contained information that was known only by her and the defendant).

¶ 39    Furthermore, because the contents of the text messages went to the very heart of the main charge in this case–potential drug dealing–and because of the factual circumstances involved–a constructive possession case where drugs were found in a common area of a residence with multiple inhabitants and where one of the other subjects in the residence had drugs packaged for delivery on his person–we find that the erroneous admission of the text messages was not harmless error. See *Pulliam*, 176 Ill. 2d at 275 ("[a]n error in the admission of evidence is harmless if properly admitted evidence is so overwhelming that no fair-minded juror could reasonably have voted to acquit the defendant"). We conclude, therefore, that defendant's conviction must be reversed and the case remanded for a new trial.

¶ 40    Prior to the new trial, the State is free to file another motion *in limine* and to seek to have some or all of the text messages admitted. The contents of the hundreds of text messages on the cell phone have not been presented to this court in this appeal and we have no way to determine whether the contents and the other circumstances involved will be sufficient to authenticate the text messages through circumstantial evidence.[6] In addition, we need not address defendant's second assertion on this issue–that the text messages contained inadmissible hearsay–because the analysis of that issue may very well change based upon the evidence presented at the hearing on the motion *in limine* as to authentication and based upon the trial court's ruling thereon. We will, however, address the remaining issue regarding the other-crimes evidence because it is likely to arise again at defendant's retrial and the evidence on that issue is likely to remain the same.

¶ 41                        B. Admissibility of Other-Crimes Evidence

¶ 42    As to the other-crimes evidence issue, defendant argues that the trial court erred in admitting his prior conviction for possession of cannabis with intent to deliver as evidence of his intent to deliver the cocaine in the present case. Defendant asserts that the prior conviction

---

[6]During the hearing on the motion *in limine*, the State or defense indicated that at least one of the messages referred to the address of the property, that another message referred to defendant's aunt Gwen, and that a third message referred to a person of large stature, as apparently was defendant.

should not have been admitted because: (1) the prior conviction was not an element of the offense or used to impeach defendant or permitted by statutory exception to the propensity rule; (2) the State presented no facts to the trial court to show that the prior offense had a threshold similarity to the charged crimes; (3) the prior conviction was not relevant in the present case because defendant was only disputing that he was in possession of the cocaine and was not disputing that whoever was in possession of the cocaine had the intent to deliver it; (4) even if intent to deliver was in dispute in the present case, the prior conviction was still not relevant on that issue since it had nothing to do with selling cocaine and only showed that, several years ago, defendant had a propensity for selling cannabis; (5) the prejudice that resulted from the admission of the bare fact of defendant's prior conviction, which was purely propensity evidence, clearly outweighed any alleged probative value; and (6) the error that occurred was not harmless beyond a reasonable doubt in the instant case since evidence of defendant's constructive possession of the substance was lacking and was highly circumstantial.

¶ 43     The State argues that the trial court's ruling on the admissibility of the other-crimes evidence was proper and should be affirmed. In response to defendant's specific assertions, the State contends first that the prior conviction was only admitted as evidence of defendant's intent to deliver in the present case and not for any of the other reasons cited by defendant. Thus, the State contends that it is irrelevant that the prior conviction was not an element of the offense, was not being used for impeachment, and was not being admitted under a statutory exception to the propensity rule. Second, the State contends that it presented sufficient evidence of similarity between the prior conviction and the current offense for the prior conviction to be admitted as evidence of defendant's intent. In making that contention, the State notes that this was not a situation where the prior conviction was being admitted to show *modus operandi* and that less similarity was needed, therefore, for the prior conviction to be admitted as other-crimes evidence. Third, the State contends that defendant's intent argument is misplaced and that intent was relevant because it was an element of the offense that had to be proven by the State. Fourth, the State contends that pursuant to the case law, the fact that different drugs were involved in the prior case does not make the prior case dissimilar from the current case. The State points out that there will always be some factual dissimilarity between other-crimes evidence and the facts of the current case. Fifth, the State contends that despite the similarities between the prior offense and the current offense, the probative value of the prior conviction outweighed the prejudicial effect. In making that contention, the State notes that the prior conviction was not admitted to show defendant's propensity to commit crime but, rather, to show defendant's intent to deliver the cocaine in the present case, a purpose for which admission is allowed under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). Sixth and finally, the State contends that any error that occurred was harmless error based upon the substantial amount of circumstantial evidence linking defendant to the cocaine in the present case.

¶ 44     As noted above, a trial court's ruling on the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. *Pikes*, 2013 IL 115171, ¶ 12; *Illgen*, 145 Ill. 2d at 364. Under the common law rule, other-crimes evidence was not admissible to show a defendant's propensity to commit crimes. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). That principle is now embodied in Illinois Rule of Evidence 404(b), which provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person

in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). "Evidence of other crimes is objectionable not because it has little probative value, but rather because it has too much. [Citation.] Such evidence overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment. [Citation.]" *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998). However, other-crimes evidence may be admitted, in the discretion of the trial court, when it is relevant for any other purpose, such as to show *modus operandi*, intent, identity, motive, or absence of mistake with respect to the crime with which the defendant is charged. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Pikes*, 2013 IL 115171, ¶ 11; see also Graham, *supra*, § 404.5, at 241-71; 2 John H. Wigmore, Evidence §§ 301 to 307 (Chadbourn rev. ed. 1979). Evidence of other crimes may also be admitted to show, by similar acts or incidents, that the act with which defendant has been charged was not performed inadvertently, accidently, involuntarily, or without guilty knowledge. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); Graham, *supra*, § 404.5, at 241-71; Wigmore, *supra*, §§ 301 to 307.

¶ 45        When evidence of other crimes is offered, the trial judge must weigh the probative value of the evidence against the prejudicial effect and should exclude the evidence, even if the evidence is relevant, if the prejudicial effect substantially outweighs the probative value. *Pikes*, 2013 IL 115171, ¶ 11; *Manning*, 182 Ill. 2d at 214; see also Ill. R. Evid. 403 (eff. Jan. 1, 2011). Although the erroneous admission of other-crimes evidence carries a high risk of prejudice and will ordinarily require a reversal, the erroneously admitted evidence must be so prejudicial as to deny the defendant a fair trial; that is, the erroneously admitted evidence must have been a material factor in the defendant's conviction such that without the evidence the verdict likely would have been different. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998). If the error was unlikely to have influenced the jury, the erroneous admission of other-crimes evidence will not warrant reversal. *Id.*

¶ 46        Having reviewed the record in the present case and the law on this issue, we find that the trial court did not commit an abuse of discretion in admitting evidence of defendant's prior conviction in 2009 for possession of cannabis with intent to deliver as some evidence of defendant's intent to deliver the cocaine in the instant case. See *Pikes*, 2013 IL 115171, ¶ 12; *Illgen*, 145 Ill. 2d at 364; *Leona W.*, 228 Ill. 2d at 460; *Donoho*, 204 Ill. 2d at 182. As noted above, Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) specifically provides for the admission of such evidence for that purpose. In addition, Illinois courts have routinely allowed evidence of a defendant's prior or subsequent drug transactions to be admitted into evidence at trial to establish a defendant's intent to deliver the drug for which the defendant is currently charged or for any other relevant and permissible purpose. See, *e.g.*, *People v. Hunter*, 124 Ill. App. 3d 516, 532 (1984) (recognizing that evidence of other drug-related crimes has frequently been held admissible where it tended to establish intent or knowledge with regard to the crime charged and rejecting the defendant's claim that the prior drug crime evidence was inadmissible unless it involved the identical substance as in the crime charged); *People v. Batinich*, 196 Ill. App. 3d 1078, 1083-85 (1990) (evidence of conversations that the defendant had with a police agent during a prior drug transaction was admissible in an unlawful delivery of a controlled substance case to show the defendant's knowledge, intent, and absence of an innocent frame of mind as to the current transaction); *People v. Miller*, 120 Ill. App. 3d 495, 499 (1983) (evidence of statements that the defendant made about future drug sales was admissible in an unlawful delivery of a controlled substance case to show the defendant's

present state of mind regarding the current transaction); *People v. Hill*, 56 Ill. App. 3d 510, 512 (1978) (same); *People v. Mitchell*, 129 Ill. App. 3d 189, 198 (1984) (evidence of drug-related conversations between the defendant and an undercover agent was properly admitted in an unlawful delivery of controlled substance case as part of the complete picture attending the offenses and to show the defendant's guilty knowledge of cocaine sales relative to the current offense); *People v. Marshall*, 256 Ill. App. 3d 310, 318-19 (1993) (testimony by police officers regarding defendant's alleged prior drug sales was properly admitted in an unlawful possession of a controlled substance with intent to deliver case to show defendant's knowledge and his intent to deliver the controlled substance in the current case); *People v. Davis*, 248 Ill. App. 3d 886, 891-96 (1993) (evidence of defendant's prior drug transactions was properly admitted in an unlawful delivery of controlled substance within 1,000 feet of public housing agency property case to show defendant's intent and motive as to the current offense); *People v. Brown*, 255 Ill. App. 3d 425, 434-36 (1993) (evidence of the defendant's prior drug sale was properly admitted in an unlawful possession of a controlled substance with intent to deliver case to show defendant's intent to deliver the controlled substance in the current offense; appellate court rejected defendant's argument that intent evidence was not relevant because defendant was only disputing whether he was in possession of the substance and was not, therefore, directly disputing intent to deliver); *People v. Clark*, 173 Ill. App. 3d 443, 453-54 (1988) (evidence of the defendant's statements to undercover police agents during a previous drug transaction regarding the defendant's involvement with the illegal drug trade was admissible at trial in an unlawful possession of a controlled substance with intent to deliver case as evidence of the defendant's criminal intent to possess and deliver the controlled substance in the current case and as an integral part of the police undercover investigation which led to the defendant's arrest); *People v. Spyres*, 359 Ill. App. 3d 1108, 1112-15 (2005) (evidence of other crimes, mostly drug-related, was properly admitted at trial in prosecution for cannabis trafficking and certain other related offenses as evidence of defendant's participation in a common design to bring cannabis into Illinois for distribution);[7] *People v. Sanderson*, 48 Ill. App. 3d 472, 474 (1977) (evidence of the defendant's prior drug transaction with same undercover police officer was properly admitted into evidence at trial in prosecution for unlawful delivery of a controlled substance as evidence of defendant's identity, knowledge, design, or system); *People v. LeCour*, 273 Ill. App. 3d 1003, 1008-09 (1995) (evidence of the defendant's prior drug transactions was admissible at trial in prosecution for unlawful possession of a controlled substance with intent to deliver to help to establish the defendant's possession of the drug, his intent to distribute it, and his ongoing business of selling it, and tended to remove any doubt that his conduct on the date of the offense was inadvertent or innocent); *People v. Walker*, 194 Ill. App. 3d 864, 867-68 (1990) (evidence of the defendant's prior sales of cannabis was admissible at trial in prosecution for unlawful possession of cannabis with intent to deliver as evidence of intent to deliver the cannabis found in his possession in the current case).

¶ 47       While it is true that there must be a "threshold similarity" between the facts of the other-crimes evidence and the facts of the current offense for the other-crimes evidence to be

---

[7]The State on appeal in the *Spyres* case also argued that the other-crimes evidence was admissible to show defendant's intent and knowledge, but the appellate court never reached those issues because it had already determined the other-crimes evidence was admissible to show defendant's participation in a common design. See *Spyres*, 359 Ill. App. 3d at 1113.

admissible (see *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)), we believe that the similarity requirement was satisfied in the instant case. The trial court was informed through the State's notice of intent that defendant's 2009 conviction was for manufacture or delivery of cannabis and was later told by the prosecutor that the conviction was actually for possession of cannabis with intent to deliver. Thus, the trial court was presented with a situation where within the past three or four years prior to the current offense, defendant was convicted of another offense where he had been in possession of a drug with the intent to deliver it. There was no question about whether defendant had actually committed the prior offense because defendant had been convicted of it. The information that was provided, albeit the bare minimum, was sufficient for the trial court to determine, in its discretion, that a general threshold similarity existed between the facts of the prior offense and the facts of the current offense.[8] See *People v. McKibbins*, 96 Ill. 2d 176, 185 (1983); *Wilson*, 214 Ill. 2d at 140; *Illgen*, 145 Ill. 2d at 372-75 (when other-crimes evidence is admitted for any purpose other than *modus operandi*, less similarity is required and only general areas of similarity need to be shown for the other-crimes evidence to be admissible). In fact, the trial court determined, although somewhat implicitly, that several of the prior offenses that the State sought to admit lacked the requisite similarity to be admitted on the issue of intent, even though they were drug-related, because they did not involve circumstances of drug delivery and only involved circumstances of drug possession. Furthermore, the fact that a different drug was involved in the prior offense did not make the prior offense and the current offense dissimilar. See *United States v. Hernandez*, 84 F.3d 931, 935-36 (7th Cir. 1996) (evidence of defendant's prior drug arrest in which defendant was in possession of 43 pounds of cannabis was sufficiently similar to current charge of knowingly and intentionally possessing cocaine and heroin with the intent to distribute to allow for admission as other-crimes evidence to show intent, knowledge, and the absence of mistake or accident, despite the fact that a different drug was involved in the prior case). As other courts have pointed out and the State has noted here, there will always be some dissimilarity between the facts of the other-crimes evidence and the facts of the current crime charged. See, *e.g.*, *Wilson*, 214 Ill. 2d at 140.

¶ 48    In reaching the conclusion that we have reached on the question of similarity, we note that we are not persuaded by the case law cited by defendant on appeal in support of a finding of insufficient similarity because those cases did not involve a factual situation that was comparable to the factual situation of the present case. We also note that defendant's argument against similarity in the trial court was that the other-crimes evidence and the crime charged were dissimilar because a different drug was involved. Defendant did not argue at any time that insufficient information had been presented to the trial court for it to make a determination of whether the prior offense and the current offense were similar. Thus, we are left without the trial court's specific thought process on that particular aspect of similarity.

¶ 49    In addition, contrary to defendant's assertion on appeal, intent to deliver was a material issue in this case. One of the crimes that defendant was charged with was possession of a controlled substance with intent to deliver. Intent to deliver was an element of the offense, and

---

[8]More information on the factual circumstances of the prior conviction is contained in the record and is attached to the certified copy of the prior conviction. We cannot determine from the record before us, however, whether the trial court considered that information when it made its decision on this issue and the parties make no assertions in that regard on appeal. Therefore, we have not considered that information in making our determination here.

the State was obligated to prove that element beyond a reasonable doubt. See *People v. Phillips*, 215 Ill. 2d 554, 574 (2005). Although defense counsel did not directly attack that particular element of the offense, other than his brief comment in opening statement (that the State had not proven defendant possessed the substance let alone that defendant intended to deliver it), defense counsel did not in any way stipulate or concede in front of the jury that intent to deliver had been proven. See *Wilson*, 214 Ill. 2d at 138 ("[a] defendant may not use ambiguity by denying commission of the act that comprises the offense, thereby seeking to bar other-crimes evidence, while at the same time leaving room to argue lack of intent to the jury"); *Davis*, 248 Ill. App. 3d at 892 ("[a]lthough a defendant cannot foreclose the prosecution from producing evidence of intent or motive through other crimes evidence simply by not presenting evidence or argument regarding intent or motive, the trial court may consider whether the defendant is making an issue of intent or motive when deciding whether to admit other crimes evidence").

¶ 50 Finally, as for the trial court's determination that the probative value of the other-crimes evidence was not substantially outweighed by the unfair prejudicial effect of the evidence to defendant, we cannot find that determination was erroneous in the instant case under an abuse of discretion standard of review. See *Illgen*, 145 Ill. 2d at 375 (the trial court's determination as to whether probative value of other-crimes evidence is substantially outweighed by its prejudicial effect will not be reversed on appeal absent an abuse of discretion); see also Ill. R. Evid. 403 (eff. Jan. 1, 2011). As is often the case where a defendant's intent has to be proven, the evidence of defendant's intent to deliver as to the current charge in the instant case was entirely circumstantial. See *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 14 (recognizing that circumstantial evidence is often the only way to prove a defendant's intent to commit a theft or other crime). The other-crimes evidence was a highly probative piece of circumstantial evidence on that issue the admission of which was specifically provided for in Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). In determining whether the other-crimes evidence would be admitted, the trial court carefully exercised its discretion and excluded several other pieces of other-crimes evidence that the State sought to admit. The trial court also took care to minimize the prejudice to defendant by giving the jury a limiting instruction both at the time of admission and during the jury instructions prior to deliberations. The prejudice to defendant was further minimized by the brief manner in which the other-crimes evidence was presented to the jury with no unnecessary information provided. This was not a case where a mini-trial on the other-crimes evidence played out in front of the jury. See *McKibbins*, 96 Ill. 2d at 186-87 (the supreme court advised against conducting a mini-trial on the prior offense at the current trial). Under these circumstances, we find that no error occurred in the admission of the other-crimes evidence.

¶ 51                                    III. CONCLUSION

¶ 52 For the above-stated reasons, we affirm the trial court's ruling admitting at trial defendant's prior conviction for unlawful possession of cannabis with intent to deliver as other-crimes evidence to show defendant's intent to deliver the cocaine in the present case. We reverse the trial court's ruling admitting at trial testimony and photographs of text-message conversations recovered from one of the cell phones found in the same drawer as the cocaine as evidence tending to connect defendant to the cell phone and the drugs. Further, because the erroneous admission of the text-message conversations in this case was not harmless error, we

also reverse defendant's conviction and remand this case for a new trial. Although not directly before us, the finding of defendant guilty in this same case for unlawful possession of a controlled substance would also be reversed and remanded for a new trial for the reasons stated (assuming that the State still seeks to prosecute defendant on that charge as well).

¶ 53     Affirmed in part and reversed in part; cause remanded.

¶ 54     JUSTICE WRIGHT, specially concurring.

¶ 55     I agree with the majority's holding that the trial court improperly allowed the State to present photographs of various text messages to the jury in the case at bar. I write separately because, although I agree with this holding, I reach the same conclusion by employing a slightly different analysis.

¶ 56     In this case, it is undisputed that the cell phone, which was discovered in the kitchen drawer (kitchen cell phone), contained text messages communicating concerns about pending and completed illegal drug transactions. I note that the defense did not dispute that *some* person or multiple persons sent those photographed text messages to and from the kitchen cell phone. Hence, I contend the authenticity of the photographed text messages was not the reason the trial court should have excluded the group exhibits. Instead, I view the issue on appeal to revolve around the foundational requirement of relevance.

¶ 57     In fairness to the trial court, the judge recognized the relevance concerns and struggled with this issue before ruling in the State's favor. However, I believe the trial court abused its discretion by admitting evidence that was not relevant for the purpose of demonstrating whether this defendant possessed or used the kitchen cell phone.

¶ 58     I conclude that the *receipt* of a particular text message that has *not* triggered a response from the recipient proves nothing about the habits or intentions of the designated *recipient*. Based on my own experience, I emphasize that a cell phone user cannot control the content of messages directed to a personal cell phone. In fact, persons, both known and unknown, elect to send uninvited, unexpected, and sometimes unwelcome text messages to other persons.

¶ 59     Next, I focus my attention on the cell phone messages the trial court allowed the jury to consider. The author of the original text messages was not established by the State. In addition, many of the anonymous messages did not generate any acknowledgment or response from the recipient cell phone user. Consequently, I conclude these anonymous text messages do not establish whether this defendant invited, expected, or actually *received* the text messages. This is not to say that my position may be different in another case where the author of the original text message is known and testifies concerning the reason for sending the text message to a particular designated recipient.

¶ 60     Next, I turn to the second set of text messages, which the court admitted into evidence. These messages contained some responsive texts from the recipient cell phone. I recognize responsive messages may contain information relevant to the identity of the *author* of each response. However, the responsive texts that the jury considered were cryptic in nature. The responses did not include any significant details that would help identify the person sending the responsive text message. Absent information suggesting this defendant could have been the only *author* of the responsive text messages, I conclude the second set of text messages did not

contain relevant information concerning whether this defendant used the kitchen cell phone as the State contends.

¶ 61    Thus, I conclude the *receipt* of a text message from an unknown author proves nothing about the identity or intentions of the unknown recipient in the case at bar. In addition, the cryptic text message replies from an unknown person did not contain any relevant information to alter the apparently deliberate anonymity of the responding cell phone user. Therefore, I agree the text messages offered by the State should have been excluded by the trial court.

¶ 62    Since my analysis is limited only to the handful of text messages presented to the jury in the case at bar, I respectfully cannot agree with the majority's view about whether other messages, which are not part of this record, may be admissible on remand. Therefore, I do not join the views expressed in paragraph 40 of the opinion.

¶ 63    Finally, I have not considered the merits of the other crimes issue because I believe evidentiary error related to the text messages is outcome determinative. Nonetheless, I agree that the conviction in this case must be reversed and the matter should be remanded for a new trial.