# Illinois Official Reports

## Appellate Court

---

**In re Marriage of LaRocque, 2018 IL App (2d) 160973**

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF JANET LaROCQUE, Petitioner and Counterrespondent-Appellant, and JOHN LaROCQUE, Respondent and Counterpetitioner-Appellee (Howard Rosenfeld, Appellant). |
| District & No. | Second District<br>Docket Nos. 2-16-0973, 2-16-0987 cons. |
| Filed | May 31, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-D-956; the Hon. Neal W. Cerne, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Robert G. Black, P.C., of Naperville (Robert G. Black, of counsel), and Howard H. Rosenfeld and Shaska R. Dice, of Rosenfeld, Hafron, Shapiro & Farmer, of Chicago, for appellants.<br><br>Michael J. Berger, Jennifer Cantrell, and Eric J. Schwab, of Berger Schatz, of Chicago, for appellee. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Burke and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a trial in the circuit court of Du Page County, the court entered a judgment dissolving the marriage of John and Janet LaRocque. As part of that order, the court sanctioned one of Janet's attorneys, Howard Rosenfeld, in the form of a $50,000 judgment against him and in favor of John. Janet appeals, challenging the court's factual findings as well as numerous rulings both prior to and during trial. Rosenfeld separately appeals the sanctions entered against him. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    John and Janet married in 1985. During the marriage, John amassed substantial wealth for the family through his efforts as a trader and investor. Janet was a stay-at-home mother to the parties' four children, the eldest of whom has since passed away. The remaining children are all emancipated. In May 2014, Janet filed a petition for dissolution of the marriage. John filed a counterpetition the following month. Janet subsequently dismissed her petition, and the case proceeded on John's counterpetition.

¶ 4    John and Janet had a large marital estate, ultimately valued by the trial court at more than $21 million. However, the parties disputed whether the assets held in certain irrevocable trusts were also part of their marital estate. The court granted John's motion for summary judgment with respect to those trusts, ruling that the assets therein were not part of the marital estate. The matter subsequently proceeded to trial on the issues of maintenance, distribution of property, and the date the marriage began its irretrievable breakdown. We will summarize these proceedings more fully below.

¶ 5                        A. John's Motion for Summary Judgment

¶ 6    In the mid-2000s, John retained counsel for the purpose of creating a comprehensive family estate plan. Over the ensuing years, he and Janet established and funded numerous irrevocable trusts. Although Janet signed documents relating to the trusts, she denied knowing any of the details of the estate plan or being involved in the planning process. It is undisputed that the parties' children and further descendants will ultimately reap substantial tax benefits from this estate plan. The problem from Janet's perspective, however, was that John's estate-planning techniques substantially reduced the size of their marital estate for purposes of these divorce proceedings. Janet thus accused John of "divorce planning."

¶ 7    Prior to trial, John filed a motion for summary judgment pertaining to the trusts. He argued that all of the property that was contributed to the trusts over the years was transferred by him and/or Janet irrevocably and with donative intent. Relying primarily on *In re Marriage of Romano*, 2012 IL App (2d) 091339, and *Johnson v. La Grange State Bank*, 73 Ill. 2d 342 (1978), John claimed that the trusts and their assets were outside of the marital estate and could not be divided in these divorce proceedings. He supported his motion with six affidavits, which are detailed below. Those affidavits, in turn, incorporated by reference more than 300 exhibits comprising thousands of pages.

¶ 8    Michael Hartz, a partner at the law firm of Katten Muchin Rosenman, LLP (Katten Muchin), submitted an affidavit in which he averred the following. In December 2004, he was retained to represent John and Janet with regard to their estate planning. Although he was the

"principal attorney for the LaRocque estate planning," his associate, Jonathan Graber, drafted documents and dealt with the clients. Over time, Graber assumed primary responsibility for the matter. According to Hartz, "[i]n addition to creating a plan to meet the LaRocque's [*sic*] objective of providing an orderly disposition of property upon death, a significant emphasis of the estate planning was to minimize federal and state estate taxes." Hartz attached to his affidavit an engagement letter wherein he agreed to represent John and his family. That letter was directed to, and signed by, John, not Janet.

¶ 9        Graber, a former employee of Katten Muchin and a current partner at Drinker Biddle & Reath LLP (Drinker Biddle), also submitted an affidavit. He averred that, in 2005, he began preparing estate planning documents for John and Janet under Hartz's supervision. A significant emphasis of this plan, Graber explained, was to minimize estate taxation while providing an orderly disposition of property upon death. He asserted that, because of the tax planning that had been implemented, the majority of the property currently owned by the various trusts should not be subject to estate taxation upon the death of John or Janet. The ultimate beneficiaries of the tax planning are the parties' children and their further descendants. Graber identified the myriad trusts that John and Janet established, and he explained the estate-planning advantages that those trusts provided. Graber also asserted in his affidavit that John engaged in loan transactions with many of the trusts. According to Graber, those transactions were authorized by the provisions of the trust documents. Furthermore, Graber attested that most of the trusts contained provisions designed to ensure that they would be taxed as "grantor trusts." Among those provisions were the power of the trustees to lend money to the grantor without adequate security and the power of the grantor to substitute property of equivalent value. According to Graber, "[t]his is beneficial from an overall family tax perspective, since property owned by John or Janet, which would ultimately be subject to estate taxes, is being used to pay the income tax obligations of trusts that will not be subject to estate taxes."

¶ 10       John also attached his own affidavit in support of his motion for summary judgment. He averred as follows. In December 2004, he retained Katten Muchin to prepare an estate plan for himself and Janet. The purposes of the estate plan were to provide for an orderly disposition of property upon his and Janet's deaths and to minimize estate taxation in the process of transferring wealth to their children. Pursuant to that plan, between 2005 and 2012, he and/or Janet established dozens of trusts, many of which were grantor retained annuity trusts (GRATs). During that same time period, he and/or Janet gifted and sold assets to the trusts. In doing so, he intended to irrevocably divest himself of ownership of those assets. To the best of his knowledge, he, as grantor, acted consistently with the terms of the trust agreements. He undertook loan transactions with "virtually all of the trusts" by borrowing principal pursuant to a series of revolving loan agreements and promissory notes. He also made loans to the trusts and sold assets to them, the latter event being an exercise of his right as grantor to substitute assets of equivalent value. The gift-tax returns that he and Janet filed from 2005 to 2012 reflected the assets that they transferred to the trusts. John identified in his affidavit the various trusts that were established. He also indicated when and how each trust was funded and, in the case of the GRATs, provided the date that each trust either had terminated or was expected to mature. He further documented his numerous loan transactions, some of which occurred almost immediately after the initial funding of the trusts.

¶ 11    Michael LaRocque, John's brother, submitted an affidavit in support of John's motion for summary judgment. He averred the following. He served as either the trustee or the trust protector of numerous trusts established by John and Janet. He understood that the purposes of the trusts were to provide an orderly distribution of property upon John's and Janet's deaths and to transfer wealth to their children while minimizing estate taxation. Michael consulted with Graber on an ongoing basis regarding the trust transactions to ensure adherence to the purposes of the trusts.

¶ 12    Daniel Asher signed an affidavit, averring as follows. He had known John since 1980, and they had been friends and business partners for more than 20 years. Asher was the trustee and investment advisor of some of the trusts at issue. In those capacities, he executed numerous documents, including purchase agreements, promissory notes, assignments, and loan agreements between John and the trusts. To the best of Asher's knowledge, all such loan and purchase transactions were in accordance with both his own fiduciary duties and the express provisions of the trust agreements.

¶ 13    The final affidavit that John submitted in support of his motion for summary judgment was from Fred Goldman. Goldman indicated that he was the chief financial officer of Equitec Group LLC, which was a holding company that supported the trading activities of John, Asher, and their respective trusts. Goldman was "highly familiar with the structure and mechanics" of the irrevocable trusts at issue. Because of that familiarity, John asked him to prepare a summary for each trust, setting forth the initial funding and the subsequent loan transactions involving John. Over the course of approximately 20 pages in his affidavit, Goldman summarized the history of transactions for each trust. The summaries reflected that John borrowed extensively from the trusts, but that he repaid the loans with interest. Certain loans were outstanding as of the date Goldman executed the affidavit.

¶ 14    Janet filed an 80-page memorandum, opposing John's motion for summary judgment. She insisted that it was not until discovery in this action that she learned of "the extent of the trust work John had engaged in during the course of the marriage." She also discovered that she would be excluded as a beneficiary of some of the trusts in the event of a divorce from John. Janet emphasized that Graber acknowledged in his deposition that he never communicated with her about the trusts. She said that her only involvement with the trusts was to blindly sign documents based on John's "misrepresentations." She claimed that, since 2005, she had been "the unwilling and unsuspecting victim of an ongoing scheme at the hands of John."

¶ 15    Janet also argued in her memorandum opposing summary judgment that the majority of the assets in the trusts had been transferred while the marriage was undergoing an irretrievable breakdown: *i.e.*, after 2010. Janet conceded that "the trusts, on their face, make it appear as though John has made irrevocable gifts to the third-party entit[ies]." Nevertheless, she argued, *Romano* and *Johnson* did not support John's legal position, as the transfers at issue were "illusory and/or colorable" and without "the requisite donative intent." Some of the factors that Janet cited in support of her contention that John had not relinquished control over the assets in the trusts were that he borrowed funds from the trusts, he named a close friend and his brother as trustees, and "[a]ll transactions with the trusts [were] with people related to John in some form." Janet repeatedly complained that she was missing information with respect to the trusts and that she required additional discovery.

¶ 16    Janet submitted a long list of materials as exhibits to her memorandum opposing summary judgment. Two of those exhibits were affidavits. One was from her accounting expert, Tom

Levato. Levato identified scores of purported deficiencies in John's production of documents during discovery. Janet also submitted her own affidavit, in which she averred as follows. She never consulted with or was advised by any attorney from Katten Muchin or Drinker Biddle. She knew that John had established a qualified personal residence trust, but she was not aware that either she or John had established or funded any other trusts. During these divorce proceedings, she learned that her signature appeared on a number of trust documents. Although her signature appeared to be genuine, she never signed those documents knowing the nature of what she was signing. To that end, during the marriage, John would frequently ask her to sign documents without telling her what she was signing. Instead, he "would simply state that the documents were 'just business' or 'nothing to worry about' or 'for the children' or 'for tax purposes.' " She was never asked to sign any document that she knew related to a trust.

¶ 17    According to Janet's affidavit, she and John began experiencing marital difficulties in late 2010. Prior to filing the dissolution action, she never knew that she was either the trustee or the beneficiary of any trust. Nor did Asher or Michael LaRocque ever contact her regarding the trusts. In June 2015, she requested trust documents from Asher and Michael, but she did not receive those documents. Prior to petitioning for divorce, she was not aware of any transactions with or gifts of property to the trusts. She was also unaware that John funded the trusts with marital assets and that he borrowed extensively from the trusts. Although she was designated as a trustee of certain trusts, she never approved any loans for John, and she did not know that he could borrow from any trust.

¶ 18    Following a lengthy hearing at which the court entertained argument from the parties' attorneys, the court granted John's motion for summary judgment. The court determined that the trusts at issue were "separate legal entities," in the sense that "neither party has a property interest in those trusts," and that "neither the trusts nor their assets [were] includable in the parties' marital estate or in either party's nonmarital estate." In the course of explaining its ruling, the court emphasized that the trusts were not illusory in form, given that they were all created by written agreements. Janet's failure to read documents before signing them was no defense. The court likewise determined that the trusts were not illusory in substance because lending is a common and proper purpose of such trusts and John repaid his loans. There was also no indication that the trusts had lost money or that the trustees had breached their fiduciary duties. The court stressed that its ruling did not preclude Janet from subsequently arguing at trial that, by creating these trusts, John nevertheless committed dissipation or fraud against Janet.

¶ 19               B. Proceedings Following Summary Judgment and Prior to Trial

¶ 20    This litigation, which was rather contentious from the outset, became even more so during the course of briefing and arguing John's motion for summary judgment. John ultimately filed a motion for sanctions against Janet and her counsel—the law firm of Rosenfeld, Hafron, Shapiro & Farmer—pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018) and section 508(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(b) (West 2016)). According to John, in the course of opposing his motion for summary judgment, Janet and her counsel "pursued a no-holds-barred litigation strategy characterized by misrepresentations of the law and the facts, baseless and frivolous claims and motions, and irresponsible accusations of wrongdoing against John and others." The court did not rule on this motion until after trial.

¶ 21 Meanwhile, the court intervened in a number of heated discovery disputes between the parties. One of the primary areas of disagreement was whether Janet had received all of the documents she requested from John. The court addressed these matters at a lengthy hearing on February 10, 2016. Janet's lead attorney, Rosenfeld, informed the court that, instead of personally reviewing the documents that John was producing in discovery, his office was submitting those documents to an accounting firm for review. According to Rosenfeld, the accountants informed him that they did not have certain documents, even though John's counsel insisted that he produced them. At a subsequent hearing on February 22, 2016, Shaska Dice, an attorney who worked with Rosenfeld, acknowledged that some of the documents that Rosenfeld had claimed were missing had simply not been inventoried by Janet's accountant. John subsequently filed a second motion for sanctions against Janet and her counsel pursuant to Rule 137 and section 508(b) of the Act for their conduct related to discovery. The court did not rule on that motion until after trial.

¶ 22                                        C. Trial

¶ 23 Janet served John with a notice of intent to claim dissipation. John admitted to dissipation of approximately $209,000 in connection with certain of his expenditures after the dissolution action was filed. That was apparently only a fraction of the amount that Janet claimed John had dissipated.

¶ 24 The matter proceeded to trial in two phases. In the first phase, the court heard evidence regarding the date that the marriage began its irretrievable breakdown. The second phase focused on issues relating to support obligations and the distribution of property.

¶ 25 The trial was originally scheduled for six dates in June 2016. On each of those dates, three attorneys appeared in court on Janet's behalf: Rosenfeld, Dice, and Andrew Harger. On the fourth day of trial, the court noted that it would need to set more dates, as it was evident that the trial would not conclude within the allotted time. When the court mentioned scheduling additional dates, Rosenfeld informed the court that Dice was expecting a baby the next month. Despite Rosenfeld's protests that he "absolutely cannot proceed without" Dice, the court scheduled additional trial dates in July. Janet subsequently filed an emergency motion to continue the trial based on Dice's unavailability. The court denied that motion. For the remainder of the trial, Rosenfeld and Harger appeared each day except for the final day, when only Rosenfeld appeared.

¶ 26                              1. Phase One of Trial

¶ 27 The trial record is voluminous. Recounting all of the evidence presented would be neither practical nor necessary for the resolution of this appeal. It will suffice to say that John and Janet were the only witnesses during the first phase of the trial and that they presented wildly different accounts of when their marriage started to break down. Generally, the evidence showed that the parties' eldest son suffered a very serious deterioration in health in late 2010 and passed away in June 2014. Janet believed that the dynamic of the marriage began to change in the wake of the son's change in health. Although the evidence showed that John and Janet sporadically consulted with or attempted to contact divorce attorneys during 2012 (or, in Janet's case, perhaps as early as 2011), neither of them actually retained counsel until the fall of 2013. Even after retaining counsel, John and Janet did not immediately petition for divorce. Instead, their attorneys exchanged letters while John and Janet both continued to live in the

marital residence until the spring of 2014. The evidence showed that John and Janet took a trip to Mexico together during late January or early February 2014. Shortly after returning, they participated in mediation sessions, which proved unsuccessful. Janet petitioned for dissolution of the marriage in May 2014.

¶ 28 Janet testified that the marriage began to deteriorate in 2011 as she became the primary caretaker for their ailing son while John rejected her requests to work and travel less. Beginning in 2011, Janet explained, she and John generally stopped going on dates together, and their social life consisted primarily of attending events with their family. She testified that in August 2013, John told the family that he intended to move out of the marital residence. According to Janet, she discovered in December 2013 that someone who she believed was John's paramour was contacting him. Janet related that the purpose of the trip to Mexico in early 2014 was to discuss divorce. She claimed that the reasons she did not pursue divorce until 2014 were that it would have been too much for the family to handle in light of the issues with their eldest son and that John had control over the family's finances. Through her attorney's examination of John, Janet attempted to establish that, after consulting with divorce lawyers in 2012, John engaged in a series of financial transactions that removed money from the marital estate.

¶ 29 John, on the other hand, testified that the marriage did not begin its irretrievable breakdown until March or April 2014. He maintained that he at all times worked with Janet to care for their ailing son, and he denied ever abandoning Janet. He recalled that he and Janet communicated and socialized with each other normally through 2013. Over Janet's objections, John introduced into evidence printouts of the parties' text messages from late 2010 to December 2012. (John said that he was unable to obtain their text messages after December 2012.) Although John admitted that both he and Janet contacted divorce attorneys in 2012, he testified that things returned to normal after they discussed the matter and agreed they did not want a divorce. John insisted that he did not divest himself of assets after speaking with a divorce attorney. He denied engaging in divorce planning, and he said that his various financial transactions were part of an ongoing estate plan. He also denied being in a dating relationship with a paramour in December 2013. Moreover, John testified, even after he and Janet retained divorce attorneys in the fall of 2013, they shared a bedroom until March 2014. John claimed that the purpose of the trip to Mexico in 2014 was to have a good time, not to discuss divorce. According to John, their relationship was "good" when they returned from Mexico in early February, and things did not get volatile between them until a month later.

¶ 30 The court found that February 1, 2014, was the date that the marriage began its irretrievable breakdown. The court noted that, although Janet claimed to have known in 2011 that divorce was inevitable, there was no evidence that she attempted to talk to John about attending counseling or saving the marriage. The court found that surprising, given that the parties had been married 25 years, had raised four children together, and had "invested a lot into this marriage." The court stated that it had to look to the objective evidence to determine when the marriage broke down. According to the court, the parties' text-message communications were "obviously crucial to that." The court cited multiple examples of text messages that demonstrated "positive communication" that was typical of a married couple. The court observed that, even in the one instance where the text messages reflected some sort of disagreement between the parties, the exchange was neither confrontational nor derogatory. The court identified other objective indications that the marriage was not irretrievably

breaking down between 2011 and 2013, such as the parties' sharing a bedroom and socializing with friends. Although John and Janet contacted divorce attorneys at certain points, the court found that this "really doesn't mean anything," because they did not file for divorce.

¶ 31 The court found that "things started to change" in fall 2013 when the parties actually retained divorce attorneys. To that end, the court credited Janet's testimony that in August 2013 the parties discussed ending the marriage. However, the court did not know whether John and Janet were "really trying to get a divorce" at that point or were instead still trying to save the marriage, given that they continued to reside together in the marital residence and did not immediately petition for divorce. Additionally, given that Janet believed that John had a paramour as of December 2013, the court failed to understand why John and Janet went to Mexico together in January 2014. In the court's opinion, it was "really, really hard to say that the marriage [was] irretrievably broken" if Janet went on a trip with John, despite believing that he had a paramour. The court discredited Janet's testimony that the purpose of the trip was to discuss divorce. The court instead deduced that this was "a last ditch effort" to save the marriage before starting mediation, which ultimately proved unsuccessful.

¶ 32 Addressing Janet's divorce planning theory, the court agreed, as a general principle, that if John were "scheming for this divorce" and "actually doing divorce planning to minimize his estate," that would be a clear indication that the parties were not working together during the time periods at issue. Although Janet introduced evidence of a number of John's financial transactions during and after 2012, the court found that this evidence was presented in a vacuum. Specifically, there was no indication that these transactions were unusual for John. To the contrary, the court found that John had funded trusts for a long period of time. There was nothing causing the court to think that John was purposefully diminishing his estate.

¶ 33                                   2. Phase Two of Trial

¶ 34 Having established February 1, 2014, as the date the marriage began its irretrievable breakdown, the matter proceeded to the second phase of trial, regarding support obligations and division of property. Some of the matters addressed during this portion of the trial—such as disputes relating to the valuation of assets, Janet's reasonable monthly expenses, and certain of John's recent expenditures—are not directly relevant to this appeal. However, one of Janet's contentions during the second phase of trial was that John depleted the marital estate over the course of many years by transferring large sums of money to the irrevocable trusts. Janet maintained that this argument was distinct from her claim of dissipation, and she proposed that the court could consider John's actions as a factor in her favor when dividing the marital estate. See 750 ILCS 5/503(d)(1) (West 2016) (directing the trial court to consider "each party's contribution to the acquisition, preservation, or increase or *decrease in value* of the marital or non-marital property" (emphasis added)). Over John's objections, the court allowed Janet to advance her depletion theory. Janet's counsel also questioned John at length about the substantial amounts of money he borrowed from, and paid back to, the irrevocable trusts. John asserted that he generally used the money he borrowed to service other existing debt, to pay bills, or to invest. According to John, since the 1980s, he had often taken out loans as part of his employment as a trader and investor.

¶ 35                          D. Judgment for Dissolution of Marriage

¶ 36        On November 1, 2016, the court entered a judgment for dissolution of marriage. The court rejected Janet's argument that the trusts were part of a divorce-planning scheme designed to harm the marital estate. Instead, the court found, in addition to offering tax benefits to the parties' children, the trusts provided John with capital for investing while protecting the marital estate from the effects of bad investments. The court determined that, contrary to Janet's claim that John used the trusts as his personal "piggy bank," John always repaid the loans with interest. The court found no case law supporting that estate planning for the benefit of the parties' children was tantamount to diminishing the marital estate.

¶ 37        The court determined that the net value of the marital estate was $21,129,655. The court divided the estate equally between John and Janet. In explaining its reasons for doing so, the court once again rejected Janet's argument that John depleted the marital estate from 2005 through 2013 by funding irrevocable trusts. The court deemed Janet's argument "extremely unpersuasive, both legally and factually," given that she signed joint gift tax returns, she failed to provide evidence of what portion of their estate was contributed to the trusts, she failed to provide evidence of any breach of fiduciary duty by the trustees, and the trusts protected the marital estate from John's volatile industry.

¶ 38        The court awarded Janet permanent maintenance in the amount of $30,000 per month. Addressing John's two pending motions for sanctions, the court entered sanctions against Rosenfeld, in the form of a $50,000 judgment against him and in favor of John, due to Rosenfeld's "unnecessary and unsupported litigation that increased the costs of litigation."

¶ 39        John filed a motion to reconsider the judgment for dissolution of marriage. The court modified the judgment in certain respects that are not relevant to this appeal. Janet and Rosenfeld filed separate notices of appeal, and we consolidated their appeals.


¶ 40                                      II. ANALYSIS

¶ 41        Janet argues that (1) the court erred in granting summary judgment in favor of John, (2) the court erred in failing to rule that the marital estate had been depleted, (3) the court erred "in all aspects of dissipation," and (4) the court should have granted her emergency motion to continue the trial. Rosenfeld separately argues that the court abused its discretion in sanctioning him.


¶ 42                          A. John's Motion for Summary Judgment

¶ 43        Janet first argues that the court erred in granting summary judgment in John's favor with respect to the irrevocable trusts. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Where the material facts are disputed or where reasonable people could draw different inferences from the facts, summary judgment is inappropriate. *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 62. In ruling on a motion for summary judgment, the court must construe the pleadings, depositions, admissions, and affidavits liberally in favor of the party opposing the motion. *Dann*, 2012 IL App (2d) 100343, ¶ 62. We review *de novo* the court's order granting summary judgment. *Dann*, 2012 IL App (2d) 100343, ¶ 62.

- 9 -

¶ 44    We begin with an overview of *Johnson* and *Romano*. *Johnson* involved two separate cases in which the plaintiff husbands challenged their respective wives' transfers of property to third parties. *Johnson*, 73 Ill. 2d at 349. Specifically, one of the wives settled a revocable trust months before she died; she funded that trust with substantially all of her assets, and she designated various family members other than her husband as the primary beneficiaries upon her death. *Johnson*, 73 Ill. 2d at 350-51. The wife in the other case opened joint savings accounts with her sister-in-law for the express purpose of ensuring that her property would not pass to her husband when she died. *Johnson*, 73 Ill. 2d at 352-53. After the wives died, the husbands filed lawsuits challenging the transfers. *Johnson*, 73 Ill. 2d at 351-53. Neither was successful in the trial court, and they both appealed. *Johnson*, 73 Ill. 2d at 352-53.

¶ 45    Our supreme court explained that, with the exception of Totten trusts,[1] "no general principles have emerged invalidating such other *inter vivos* transfers *per se* in respect to the marital rights of surviving spouses." *Johnson*, 73 Ill. 2d at 356-57. The reason is that "the owner of property has an absolute right to dispose of his property during his lifetime in any manner he sees fit, and he may do so even though the transfer is for the precise purpose of minimizing or defeating the statutory marital interests of the spouse in the property conveyed." *Johnson*, 73 Ill. 2d at 357. Indeed, the court continued, "[s]uch a gift or transfer is not vulnerable or subject to attack by the surviving spouse unless the transaction is a sham and is 'colorable' or 'illusory' and is tantamount to a fraud." *Johnson*, 73 Ill. 2d at 358.

¶ 46    According to the court, although case law on the topic used the phrase " 'intent to defraud,' " "[w]hen the cases discuss fraud on the marital rights of the surviving spouse, they are not considering fraud in the traditional sense." *Johnson*, 73 Ill. 2d at 358. Instead, the court explained, the phrase " 'intent to defraud' " "must be construed in connection with the words 'illusory' and 'colorable.' " *Johnson*, 73 Ill. 2d at 359. To that end, "an illusory transfer is one which takes back all that it gives, while a colorable transfer is one which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor." *Johnson*, 73 Ill. 2d at 359. The court thus held:

> "[A]n *inter vivos* transfer of property is valid as against the marital rights of the surviving spouse unless the transaction is tantamount to a fraud as manifested by the absence of donative intent to make a conveyance of a present interest in the property conveyed. Without such an intent the transfer would simply be a sham or merely a colorable or illusory transfer of legal title." *Johnson*, 73 Ill. 2d at 361.

Applying these standards to the facts adduced at trial in the respective cases at hand, the court determined that none of the transfers were vulnerable to attack. *Johnson*, 73 Ill. 2d at 363, 368.

¶ 47    In *Romano*, this court applied the principles articulated in *Johnson* to the context of a divorce proceeding involving irrevocable trusts. In that case, the husband, Daniel, had nonmarital interests in six family businesses. *Romano*, 2012 IL App (2d) 091339, ¶¶ 5, 7, 52, 54, 65, 73. During his marriage to Cynthia, Daniel's family "began to implement an estate plan that ultimately involved transferring the family's interests in these entities into and out of various trusts." *Romano*, 2012 IL App (2d) 091339, ¶¶ 4-5. Specifically, Daniel established three irrevocable trusts, two of which were GRATs. *Romano*, 2012 IL App (2d) 091339,

---

[1]A Totten trust is "[a] revocable trust created by one's deposit of money, typically in a savings account, in the depositor's name as trustee for another." Black's Law Dictionary 1552 (8th ed. 2004).

¶¶ 5, 11. Daniel argued that the assets in those trusts "constituted third-party property and therefore were not subject to allocation by the court." *Romano*, 2012 IL App (2d) 091339, ¶ 27. One of Cynthia's arguments in response was that Daniel's transfers to and from the trusts constituted a fraud on her marital rights. *Romano*, 2012 IL App (2d) 091339, ¶ 99. Jay Tarshis, a trusts and estates attorney, testified on Cynthia's behalf at trial and opined that the trusts " 'contained certain ties or connections which demonstrated that [Daniel] had retained sufficient control of the trusts to make the transfer of assets illusory and/or colorable.' " *Romano*, 2012 IL App (2d) 091339, ¶ 101. Cynthia claimed that she did not know about any of those ties until after the dissolution action commenced. *Romano*, 2012 IL App (2d) 091339, ¶ 101. The trial court granted Daniel's motion for a directed finding against Cynthia as to her claim of fraud on her marital rights. *Romano*, 2012 IL App (2d) 091339, ¶ 99.

¶ 48    On appeal, citing *Johnson*, we explained:

"In Illinois, an owner has an absolute right to dispose of his property during his lifetime in any manner he sees fit, and he may do so even though the transfer is for the precise purpose of defeating his spouse's statutory marital interests in the property conveyed. [Citation.] As such, a transfer is not vulnerable to attack by a spouse unless the transaction 'is a sham and is colorable or illusory and is tantamount to a fraud.' " (Internal quotation marks omitted.) *Romano*, 2012 IL App (2d) 091339, ¶ 103 (quoting *Johnson*, 73 Ill. 2d at 358).

In a footnote, we asserted: "While *Johnson* dealt with an *inter vivos* transfer of property in relation to the rights of a surviving spouse, the same test may be properly applied with respect to dissolution proceedings." *Romano*, 2012 IL App (2d) 091339, ¶ 103 n.6. In support of that proposition, we cited *Hofmann v. Hofmann*, 94 Ill. 2d 205, 231 (1983) (Ryan, C.J., concurring in part and dissenting in part).

¶ 49    We affirmed the directed finding in favor of Daniel, holding that the trial court's ruling was not against the manifest weight of the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 114. We reasoned that, although Tarshis identified certain ties that he believed rendered the trusts at issue illusory, he also made numerous concessions that allowed the trial court to reject his opinion. *Romano*, 2012 IL App (2d) 091339, ¶ 114. Among Tarshis's concessions was that three of the proposed ties—naming a family member as a trustee, retaining the ability to substitute assets in the trusts with other assets, and retaining the ability to obtain unsecured loans from the trusts—were identified in the Internal Revenue Code as features of grantor trusts. *Romano*, 2012 IL App (2d) 091339, ¶¶ 109, 114. Moreover, although Cynthia's interests in the trusts at issue would terminate upon the dissolution of the marriage, we noted that Tarshis acknowledged that Daniel had named Cynthia as a beneficiary, despite having no obligation to do so. *Romano*, 2012 IL App (2d) 091339, ¶¶ 112-14. In the process of distinguishing a case that Cynthia relied on, we emphasized that (1) Daniel did not create the disputed trusts in contemplation of divorce, and the estate plan predated the dissolution petition by five years, (2) there was no indication that Daniel discussed divorce ramifications when preparing the estate plan with his attorney, and (3) there was no evidence that Daniel made any misrepresentations to Cynthia about the estate plan or otherwise forced her to enter an agreement regarding the allocation of assets upon divorce. *Romano*, 2012 IL App (2d) 091339, ¶ 118.

¶ 50    Under the standards articulated in *Johnson*, and in light of this court's opinion in *Romano*, it is clear that John was entitled to summary judgment on his contention that the trusts and the

assets therein were not part of the parties' marital estate. John met his initial burden by presenting six affidavits, which collectively established that the trusts were valid and that he conveyed assets to the trusts with donative intent. Specifically, John demonstrated that the trusts were funded as part of a comprehensive estate plan designed to provide an orderly disposition of property upon the parties' deaths while minimizing exposure to estate taxation.

¶ 51 Janet never disputed that the trusts were valid and distinct legal entities. The limited question before the trial court was whether there was a genuine issue of material fact as to whether the transfers to the trusts were nevertheless tantamount to a fraud due to "the absence of donative intent to make a conveyance of a present interest in the property conveyed." *Johnson*, 73 Ill. 2d at 361; see also *Romano*, 2012 IL App (2d) 091339, ¶ 103. The trusts were irrevocable, so John certainly could not transfer assets out of the trusts at will. That fact alone made it an uphill battle for Janet to argue that the transfers to the trusts were "illusory" or "colorable." See *Johnson*, 73 Ill. 2d at 359 ("[A]n illusory transfer is one which takes back all that it gives, while a colorable transfer is one which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor.").

¶ 52 Unlike the wife in *Romano*, Janet did not produce expert testimony to question the legitimacy of the trusts and the various transfers. Instead, Janet relied on her own affidavit. She acknowledged signing trust documents but generally professed ignorance due to her failure to read those documents. As the trial court correctly determined, that was not a defense. See *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 57 ("In the absence of fraud, which must be proved by clear and convincing evidence [citation], a man in possession of all his faculties who signs a contract cannot relieve himself from the obligations of the contract by saying he did not know or understand what it contained."). The "misrepresentations" that Janet claimed John made in connection with having her sign the documents were not misrepresentations at all. Janet averred that John told her that the documents were "just business," "nothing to worry about," "for the children," or "for tax purposes." None of John's purported statements were palpably untrue or even misleading. We are also mindful that the estate planning process in this case was put into motion approximately six years before Janet claimed the marriage started to break down and nine years before she petitioned to dissolve the marriage. This is not a case like *In re Marriage of Frederick*, 218 Ill. App. 3d 533, 539 (1991), for example, where the husband changed his estate plan after consulting with a divorce attorney, procured his wife's signature on a document by misrepresenting its meaning, and shortly thereafter petitioned for divorce.

¶ 53 In her memorandum opposing summary judgment, Janet said that she had no input regarding the estate planning process and that she never even met with the estate planning attorneys. Be that as it may, attorney Hartz testified in his deposition that it is not unusual to deal with just one spouse for purposes of estate planning.[2] Janet fails to direct our attention to any evidence in the record to the contrary. Janet also mentioned that, in the event of a divorce, she would no longer be a beneficiary of some of the trusts. But she does not explain why such a provision in the trust agreements would inherently render any transfers to the trusts "illusory" or "colorable." We note that John was likewise excluded as a beneficiary of Janet's gift trust and her nonexempt gift trust if he divorced Janet. We also note that the wife in *Romano* was

---

[2]Janet included Hartz's deposition as an exhibit to her memorandum opposing summary judgment.

excluded as a beneficiary of the disputed trusts in the event of a divorce (*Romano*, 2012 IL App (2d) 091339, ¶ 113), yet this court upheld the trial court's finding that there was no fraud against her marital interests.

¶ 54 In arguing that John retained control over the assets in the trusts, Janet pointed out that John named his close friend and his brother as trustees, he borrowed extensively from the trusts, and he retained the power to substitute assets in the trusts for other assets. But Graber's affidavit, which was submitted in support of John's motion for summary judgment, established that two of the features of grantor trusts are (1) the power of the trustee to lend to the grantor without adequate security and (2) the power of the grantor to substitute property of equivalent value. The wife's expert in *Romano* testified similarly. *Romano*, 2012 IL App (2d) 091339, ¶ 109. Furthermore, Janet failed to demonstrate that it was improper for John to designate his close friend and his brother as trustees. In fact, Hartz indicated in his deposition that it is very typical for a trustee to be a business partner of the grantor.

¶ 55 Contrary to what Janet implied in her memorandum opposing summary judgment, there was also no evidence that the trustees breached their fiduciary duties. Although John routinely borrowed money from the various trusts with the trustees' approval, and in some cases did so almost immediately after funding the trusts, the transactions were always documented by loan agreements. John repaid those loans with interest. And while Janet repeatedly asserted in her memorandum opposing summary judgment that she required additional discovery with respect to the trusts, she does not identify that on appeal as a reason for reversing the court's judgment.

¶ 56 It is important to highlight the narrow scope of the trial court's summary judgment ruling. The court declared that the trusts at issue were "separate legal entities" and that "neither the trusts nor their assets [were] includable in the parties' marital estate or in either party's nonmarital estate." There being no evidence that John lacked donative intent or that he otherwise improperly retained control over the assets that were transferred to the trusts, summary judgment on that limited issue was appropriate. The court did not preclude Janet from subsequently arguing at trial that, by transferring assets to the trusts, John nevertheless committed dissipation or otherwise depleted the marital estate. Therefore, Janet's contention in her brief on appeal that the court "embraced a mechanism whereby persons obtaining great wealth during long years of marriage *** can remove that from any consideration in the marital estate" is inaccurate.

¶ 57 Janet attempts to distinguish *Romano* both procedurally and factually. Although she is correct that *Romano* involved a grant of a directed finding rather than a grant of summary judgment, the substantive legal principles espoused in *Romano* and *Johnson* are equally applicable here. And while Janet identifies numerous purported factual distinctions between *Romano* and the instant case, she fails to explain why any of those matters are so significant as to render that case inapplicable.

¶ 58 Janet contends that the trial court's ruling undermines the presumption that property acquired during a marriage is marital property. For the same reasons, she criticizes the *Romano* court's decision to apply the holding of *Johnson* in a divorce setting. Janet directs our attention to section 503(b)(1) of the Act, which provides, in relevant portion: "For purposes of distribution of property, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage is presumed marital property." 750 ILCS 5/503(b)(1) (West 2016). She also cites cases containing boilerplate language that there is a preference for classifying property as marital property, and

that a party claiming a nonmarital interest bears the burden of proving by clear and convincing evidence that the property falls into one of the enumerated statutory exceptions.

¶ 59   Janet's arguments miss the mark. The statute and the cases she discusses pertain to distinguishing between marital property and nonmarital property. Irrespective of whether property is marital or nonmarital, it is before the court in a proceeding for dissolution of marriage and is subject to distribution. See 750 ILCS 5/503(d) (West 2016) ("In a proceeding for dissolution of marriage or declaration of invalidity of marriage, *** the court shall assign each spouse's non-marital property to that spouse. It also shall divide the marital property without regard to marital misconduct in just proportions ***."). The issue here was completely different: whether the assets in the irrevocable trusts were before the court in the first instance and therefore subject to distribution. Nothing in *Romano* undermines the presumption that property acquired during the marriage is marital property. To the extent that Janet's arguments reflect a broader concern that spouses can in all cases transfer assets with complete immunity, her concern is misplaced. In appropriate cases, such as where the circumstances reflect that one party intended to defraud the other, courts will not hesitate to set aside transfers to trusts. See, *e.g.*, *Frederick*, 218 Ill. App. 3d at 539. However, as explained above, this is not such a case.

¶ 60   Janet also asserts that, in the portion of the judgment for dissolution of marriage addressing the issue of sanctions against her counsel, the court "commented on the summary judgment procedure" and "chastised [her] for not providing any counter-affidavits" in opposition to the motion. According to Janet, the court erred in three respects: (1) she indeed provided her own counter-affidavit, along with other evidentiary materials, (2) the affidavits supporting John's motion for summary judgment were "replete with conclusions and argument" in violation of Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013), and (3) the real issue in the summary judgment motion was the circumstances surrounding the trusts, not the propriety of the trusts themselves.

¶ 61   These arguments are unpersuasive. Although Janet indeed attached numerous materials to her memorandum opposing summary judgment, as explained above, they evidenced no genuine issue of material fact precluding summary judgment. Additionally, for two distinct reasons, Janet forfeited any objection to the legal sufficiency of John's affidavits. First, she failed to challenge those affidavits in the trial court. See *Fooden v. Board of Governors of State Colleges & Universities*, 48 Ill. 2d 580, 587 (1971) ("[T]he sufficiency of an affidavit cannot be tested for the first time on appeal where no objection was made either by motion to strike, or otherwise, in the trial court."). She also failed to identify in her appellant's brief any particular statements in the affidavits that she believed violated Rule 191(a). See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (points not argued in the appellant's brief are forfeited and shall not be raised in a reply brief). We will not consider these arguments. Furthermore, Janet's contention about focusing on the circumstances surrounding the trusts merely rehashes arguments that we have already addressed and rejected.

¶ 62   Janet finally criticizes the trial court for not determining the time of the irretrievable breakdown of the marriage before ruling on the motion for summary judgment. She has forfeited this argument by failing to cite authority. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (failure to cite relevant authority results in forfeiture of the argument, as it is not the role of the court to "research the issues on the appellant's behalf").

¶ 63    For all of these reasons, the trial court properly granted summary judgment in favor of John with respect to the trusts.

¶ 64                                    B. Depletion of the Marital Estate

¶ 65    Janet next argues that the trial court, when apportioning the parties' marital property, erred in failing to rule that the marital estate had been depleted.

¶ 66    Section 503(d) of the Act directs the court to consider numerous factors when dividing marital property between the parties. 750 ILCS 5/503(d) (West 2016).

> "A reviewing court applies the manifest weight of the evidence standard to the factual findings for each factor on which a trial court may base its property disposition, but it applies the abuse of discretion standard in reviewing the trial court's final property disposition (and how the trial court considers those factors)." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005).

¶ 67    Janet directs her arguments toward the court's factual findings rather than its ultimate disposition of the marital property. We thus employ the manifest-weight-of-the-evidence standard of review. A factual finding is not against the manifest weight of the evidence unless " 'the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence.' " *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 35 (quoting *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007)).

¶ 68    Janet focuses exclusively on section 503(d)(1), which provides that a court in a proceeding for dissolution of marriage or declaration of the invalidity of marriage

> "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:
>
>     (1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including (i) any decrease attributable to an advance from the parties' marital estate under subsection (c-1)(2) of Section 501; (ii) the contribution of a spouse as a homemaker or to the family unit; and (iii) whether the contribution is after the commencement of a proceeding for dissolution of marriage or declaration of invalidity of marriage[.]" 750 ILCS 5/503(d)(1) (West 2016).

Following the first phase of the trial, the court determined that the parties' marriage began to undergo an irretrievable breakdown on February 1, 2014. The practical result of that finding was that Janet was precluded from arguing in the second phase of the trial that John *dissipated* assets prior to that date. See *Schneeweis*, 2016 IL App (2d) 140147, ¶ 33 (defining dissipation as the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown' " (internal quotation marks omitted) (quoting *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990))). Over John's objections, the court allowed Janet to present her theory that, for purposes of section 503(d)(1) of the Act, John nevertheless *depleted* the marital estate over the course of many years by transferring large sums of money to irrevocable trusts. The court ultimately rejected Janet's theory as "extremely unpersuasive, both legally and factually," given that she signed joint gift-tax returns, she failed to provide evidence of what portion of their estate was contributed to the trusts, she failed to provide evidence suggesting

any breach of fiduciary duty by the trustees, and the trusts protected the marital estate from John's volatile industry.

¶ 69     In his appellee's brief, John argues that Janet's "depletion" theory is merely an attempt to avoid the reality that dissipation can occur only while the marriage is undergoing an irretrievable breakdown. He further maintains that Janet's theory is unsupported by the facts, as the parties had virtually no assets when they first married and John's efforts as a successful investor increased their net worth to more than $21 million when the judgment for dissolution was entered.

¶ 70     John raises legitimate concerns about whether Janet's depletion theory was an improper attempt to circumvent the court's ruling regarding the date that the marriage began its irretrievable breakdown. However, we need not comment further on this issue. The court indeed allowed Janet to advance her depletion theory, and the court provided compelling reasons for rejecting that theory, based on the facts presented at trial. The evidence supported the court's findings that the trusts at issue served proper family purposes and were managed appropriately. Moreover, given that the court cited Janet's signature on the gift-tax returns as one of its reasons for rejecting her depletion theory, it seems that the court did not find Janet's claims of lack of knowledge of the trusts to be entirely credible. See *Romano*, 2012 IL App (2d) 091339, ¶ 95 ("As the trier of fact, the trial court was in a superior position to observe the demeanor of the witnesses, determine and weigh their credibility, and resolve any conflicts in their testimony."). The court's findings were not against the manifest weight of the evidence.

¶ 71     The two cases Janet cites in support of her depletion theory are distinguishable. In *In re Marriage of Norris*, 252 Ill. App. 3d 230, 233 (1992), the evidence showed that the husband "spent millions of dollars on drugs, alcohol, women and poor business decisions during the marriage." It appears from the appellate court opinion in *Norris* that the money the husband spent on such activities might have been his own nonmarital property. Even assuming that the money Mr. Norris squandered was marital property, any attempt by Janet to compare John's conduct in creating the family trusts to Mr. Norris's degenerate lifestyle is woefully off-base.

¶ 72     Janet also relies on *In re Marriage of Lee*, 246 Ill. App. 3d 628 (1993). That case involved dissipation, not depletion, of the marital estate for purposes of section 503(d)(1). Moreover, *Lee* bears no factual resemblance to the present case. In *Lee*, in the months immediately preceding the parties' separation, the husband used $166,719 of marital funds to purchase bonds for his children and to contribute to their Totten trusts. *Lee*, 246 Ill. App. 3d at 631. On the day the parties separated, the husband transferred another $100,000 to an irrevocable trust for the benefit of the children. *Lee*, 246 Ill. App. 3d at 631. The appellate court determined that the husband's history of transferring $20,000 to his children annually did not justify his substantially larger transfers in the months preceding the separation. *Lee*, 246 Ill. App. 3d at 635. Unlike in *Lee*, there was no evidence here that John contributed unusual amounts of money to the irrevocable trusts in anticipation of imminent divorce proceedings.

¶ 73                                    C. Dissipation

¶ 74     Janet next argues that the court "erred in all aspects of dissipation." Specifically, she contends that the court abused its discretion in admitting evidence of the parties' text messages and set an incorrect time of the breakdown of the marriage.

1. Admission of the Text Messages

¶ 76 We review the trial court's decision to admit documentary evidence, including text messages, for an abuse of discretion. *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011). A party provides the foundation for admitting a document by identifying and authenticating it. *Chromik*, 408 Ill. App. 3d at 1046. Illinois Rule of Evidence 901(a) (eff. Jan. 1, 2011) states that the requirements of identification and authentication are "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." See also *People v. Walker*, 2016 IL App (2d) 140566, ¶ 13. A party may satisfy these requirements in any number of ways, such as by introducing "[t]estimony that a matter is what it is claimed to be" or through evidence of "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Ill. R. Evid. 901(b)(1), (4) (eff. Jan. 1, 2011); see also *Walker*, 2016 IL App (2d) 140566, ¶ 13. "After the proponent of the evidence completes laying the foundation, the court may permit opposing counsel to conduct a limited cross-examination, referred to as *voir dire*, on the foundation offered." Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 901.1, at 803 (8th ed. 2004); see also *Bazzell-Phillips & Associates, Inc. v. Cole Hospital, Inc.*, 54 Ill. App. 3d 188, 190 (1977). "In reaching its determination as to admissibility, the court must view all the evidence introduced as to authentication or identification, including issues of credibility, most favorable to the proponent." Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 901.1, at 803 (8th ed. 2004). "If upon consideration of the evidence as a whole, the court determines that the evidence is sufficient to support a finding by a reasonable [trier of fact] viewing the evidence most favorable to the proponent that it is more probably true than not true that the matter in question is what its proponent claims, the evidence will be admitted." Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 901.1, at 803 (8th ed. 2004). A finding of authentication merely means that there is sufficient justification for presenting the proffered evidence to the trier of fact. *People v. Downin*, 357 Ill. App. 3d 193, 202-03 (2005). Even where the authentication requirement is satisfied, the opposing party remains free to contest the genuineness of the writing, and it is the role of the trier of fact to determine the ultimate issue of authorship. *Downin*, 357 Ill. App. 3d at 203.

¶ 77 During the first phase of the trial, John identified Exhibits 118 and 119 as printouts of thousands of text communications between himself and Janet from the end of 2010 through 2012. To establish the foundation for admitting those exhibits into evidence, he explained as follows. He found an iPhone backup file when he accessed the family's shared "iCloud" account. He downloaded that file onto another iPhone. Upon reviewing the file on that iPhone, he discovered that it contained a series of chats between himself and Janet. He then gave the iPhone to his attorneys to print the messages, and those printouts were Exhibits 118 and 119. John attested to the accuracy of Exhibits 118 and 119. He claimed to remember many of the messages, and he said that some of the phrases used in the messages were things only he and Janet would know. Over Janet's objections, the court admitted Exhibits 118 and 119 into evidence.

¶ 78 We hold that the court did not abuse its discretion in admitting these exhibits. John properly identified and authenticated the documents by establishing that they accurately depicted messages that the parties sent each other. In other words, he demonstrated that the documents were what he claimed them to be. See Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). Janet was free to dispute the authenticity of the texts, in which case it would have been up to the trial

court as the trier of fact to determine authorship. See *Downin*, 357 Ill. App. 3d at 203-04. We note that Janet never actually denied the authenticity of any of the communications reflected in Exhibits 118 and 119, although she believed that there were "things missing from there."

¶ 79     *Chromik*, a case cited by Janet, supports our conclusion that the trial court properly admitted Exhibits 118 and 119. The defendant in *Chromik* was convicted of aggravated criminal sexual abuse of a minor. *Chromik*, 408 Ill. App. 3d at 1030. At trial, the victim testified that she exchanged numerous text messages with the defendant and that she presented some, but not all, of those messages to the administrators at her high school. *Chromik*, 408 Ill. App. 3d at 1032. She testified that, as she read the messages aloud, the school principal typed the content of those messages into a computer. *Chromik*, 408 Ill. App. 3d at 1032. The principal's testimony mirrored the victim's testimony, but he additionally acknowledged that the spell-check function in his word-processing program had changed the spelling of some of the words he typed. *Chromik*, 408 Ill. App. 3d at 1033. The principal was unable to identify any particular messages that had been affected by this spell-check function. *Chromik*, 408 Ill. App. 3d at 1033. A police officer testified that he compared the defendant's cell-phone records to the document created by the principal, and he determined that the dates and times of the messages on the documents matched. *Chromik*, 408 Ill. App. 3d at 1034. The defendant testified on his own behalf; although he admitted sending certain of the messages, he disagreed with the victim regarding the meaning of those messages. *Chromik*, 408 Ill. App. 3d at 1035.

¶ 80     One of the defendant's arguments on appeal was that the trial court erred in admitting into evidence the principal's transcription of the text messages. *Chromik*, 408 Ill. App. 3d at 1046. The court understood that "the transcription may not have evinced, with 100% accuracy, the text messages sent from defendant to [the victim] as some words were changed via the word processor's spell-check feature." *Chromik*, 408 Ill. App. 3d at 1047. Nevertheless, the court found it significant that the dates and times of the text messages, as reflected in the principal's transcription, mirrored the telephone company's records. *Chromik*, 408 Ill. App. 3d at 1047-48. Moreover, the court noted, the victim "testified as to the content of the messages and defendant acknowledged the accuracy of a number of the messages as transcribed by the principal." *Chromik*, 408 Ill. App. 3d at 1048. The court also emphasized that the trial court allowed the parties to present their respective interpretations of the messages. *Chromik*, 408 Ill. App. 3d at 1048. Under those circumstances, the court held that the trial court did not abuse its discretion in admitting the principal's transcription into evidence. *Chromik*, 408 Ill. App. 3d at 1048.

¶ 81     The argument for admitting Exhibits 118 and 119 here is even more compelling than the argument for admitting the principal's transcription in *Chromik*. John was either the author or a recipient of every text message reflected in Exhibits 118 and 119, so he was thus in a position to identify and authenticate those messages. Unlike in *Chromik*, Exhibits 118 and 119 purportedly contained the actual messages between the parties, not a third party's transcription of the messages. Additionally, unlike in *Chromik*, there was no indication here that the substance of the messages had been altered in any way. For these reasons, the trial court did not abuse its discretion in admitting Exhibits 118 and 119.

¶ 82 To the extent that Janet raises new issues in her reply brief—including that the trial court's ruling "flies directly in the face of" Illinois Rule of Evidence 106 (eff. Jan. 1, 2011)[3] or that the court should not have admitted the exhibits as substantive evidence—those contentions are forfeited and we will not consider them.[4] Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (points raised for the first time in a reply brief are forfeited).

¶ 83 At oral argument, Janet's counsel directed our attention to "*Harper*" and "*Watkins*." Presumably, counsel was referring to *People v. Harper*, 2017 IL App (4th) 150045, and *People v. Watkins*, 2015 IL App (3d) 120882. Neither of those cases provides support for disturbing the trial court's decision to admit the text messages between John and Janet. In *Harper*, because a Verizon employee testified that a certain phone number was assigned to the defendant's account, there was a proper foundation to introduce evidence that the defendant sent and received the text messages at issue. *Harper*, 2017 IL App (4th) 150045, ¶ 58. Nevertheless, the appellate court held that the content of those text messages was inadmissible, given that the State was unable to identify the person who sent the defendant "extremely prejudicial" messages containing "blatant hearsay" (*i.e.*, that the word on the street was that the defendant was involved in a murder). *Harper*, 2017 IL App (4th) 150045, ¶¶ 62-63. Unlike in *Harper*, John established the identity of the parties who sent and received the texts.

¶ 84 In *Watkins*, the State attempted to link the defendant to a particular cell phone that was found in a drawer in a common area during the search of a home. *Watkins*, 2015 IL App (3d) 120882, ¶ 38. However, the only indication of any such connection was that some texts that were sent to the phone were directed to somebody with the same first name as the defendant. *Watkins*, 2015 IL App (3d) 120882, ¶ 38. The appellate court thus determined that the State failed to properly authenticate the texts as being sent to the defendant. *Watkins*, 2015 IL App (3d) 120882, ¶ 38. Here, by contrast, Janet identified her phone number in open court, so there was no dispute as to whether she owned and used the phone at issue.

¶ 85 2. Irretrievable Breakdown of the Marriage

¶ 86 Apart from challenging the admissibility of Exhibits 118 and 119, Janet criticizes the weight that the trial court attributed to those exhibits. That is intertwined with her other argument regarding dissipation: the trial court set an incorrect time of the breakdown of the marriage. According to Janet, the court erroneously "set the date of irreconcilable breakdown of the marriage as February 1, 2104 [*sic*]," as opposed to determining "when the marriage was 'undergoing' an irreconcilable breakdown." After reciting the evidence most favorable to her own position, Janet submits that "[t]he court had plenty before it to consider the marriage irreconcilably broken long before February 1, 2014."

---

[3]That rule provides: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Ill. R. Evid. 106 (eff. Jan. 1, 2011).

[4]Janet also questions in her reply brief whether printouts of text messages "could constitute the 'original.' " We note that Illinois Rule of Evidence 1001(3) (eff. Jan. 1, 2011) provides that "[i]f data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.' "

¶ 87    Section 503(d) of the Act lists numerous factors for the trial court to consider when determining how to divide marital property. 750 ILCS 5/503(d) (West 2016). One of those factors is "the dissipation by each party of the marital property." 750 ILCS 5/503(d)(2) (West 2016). "Dissipation" means the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " (Internal quotation marks omitted.) *Schneeweis*, 2016 IL App (2d) 140147, ¶ 33 (quoting *O'Neill*, 138 Ill. 2d at 497). It is the role of the trial court to determine whether dissipation has occurred, and we will not disturb its factual findings in that respect unless they are against the manifest weight of the evidence. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008).

¶ 88    It is error for a court to assess dissipation by looking to "when the parties' marriage had completed the process of breaking down," rather than when the marriage "began undergoing an irreconcilable breakdown." *Holthaus*, 387 Ill. App. 3d at 375. However, contrary to what Janet proposes, the record here, when considered as a whole, confirms that the trial court applied the correct legal standard. In Janet's counsel's closing argument, he compared the beginning of the irretrievable breakdown of a marriage to throwing an egg off of a building; it goes down and down until it hits the ground and breaks. The trial court embraced that analogy in its lengthy oral ruling. For example, toward the beginning of its ruling, the court noted that the breakdown of a marriage is inevitable "when the egg has been dropped." The court concluded its ruling by saying the following:

> "All right. So the question then is when do I think that the marriage broke down or that irretrievable date when the egg was dropped. I think it occurred during the time that they were in Cabo San Lucas when they realized that their marriage was not going to be saved. So I'm finding it to be February 1st of 2014."

It is clear that the court found that the metaphorical egg "dropped," not "shattered," on February 1, 2014.

¶ 89    As an additional indication that the trial court applied the correct standard, we note that the court cited our decision in *Romano* in the course of explaining its ruling. *Romano* explicitly stated that "[i]n *Holthaus*, we rejected the notion that dissipation occurs only *after* an irreconcilable breakdown." (Emphasis in original.) *Romano*, 2012 IL App (2d) 091339, ¶ 89. Having cited *Romano*, it seems certain that the trial court was aware of the correct standard.

¶ 90    Furthermore, the trial court's finding that the irretrievable breakdown of the parties' marriage began on February 1, 2014, was not against the manifest weight of the evidence. The parties presented drastically different accounts of their marriage between 2011 and early 2014. Much of the evidence that Janet highlights in her brief was actually disputed at trial. For example, John (1) denied that their eldest son's serious illness generated the breakdown of the marriage, (2) denied that Janet contacted a divorce attorney in 2011, (3) denied rejecting Janet's pleas for assistance with their son, (4) denied that they communicated only by texts as of 2011, (5) denied having a paramour by Christmas 2013, and (6) denied that the purpose of their trip to Mexico in 2014 was to discuss a divorce settlement. Faced with conflicting testimony at virtually every turn, the trial court understandably placed significant weight on the parties' texts, which tended to show the parties communicating in a manner that was inconsistent with Janet's claims of estrangement. Moreover, although John and Janet both consulted with divorce attorneys in 2012, the court could have credited John's testimony that the parties agreed at that time that they did not want a divorce. Even after John and Janet

retained divorce attorneys in the fall of 2013, they did not immediately petition for dissolution of the marriage. Instead, they continued to cohabitate in the marital residence, and they took a trip to Mexico together. The court thus drew the reasonable inference that the purpose of the trip to Mexico was to attempt to save their marriage.

¶ 91    In light of the conflicting evidence, we cannot say that the trial court's conclusion that the marriage began its irretrievable breakdown on February 1, 2014, was against the manifest weight of the evidence.

¶ 92                            D. Janet's Motion to Continue Trial

¶ 93    Janet finally argues that the court erred in refusing to continue the matter mid-trial to accommodate the unavailability of one of her attorneys due to imminent childbirth.

¶ 94    Litigants do not have an absolute right to a continuance. *Merchants Bank v. Roberts*, 292 Ill. App. 3d 925, 927 (1997). Illinois Supreme Court Rule 231(f) (eff. Jan. 1, 1970) provides that "[n]o motion for the continuance of a cause made after the cause has been reached for trial shall be heard, unless a sufficient excuse is shown for the delay." "Once the case reaches the trial stage, the party seeking a continuance must provide the court with 'especially grave reasons' for the continuance because of the potential inconvenience to the witnesses, the parties, and the court." *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 23 (quoting *In re Marriage of Ward*, 282 Ill. App. 3d 423, 430-31 (1996)). We review the trial court's decision to deny a motion for a continuance for an abuse of discretion, which occurs where the ruling is "arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *K&K Iron Works*, 2014 IL App (1st) 133688, ¶ 22.

¶ 95    We find no abuse of discretion. The court offered a panoply of reasons for denying Janet's emergency motion for a continuance: (1) the parties had spent a "flabbergasting" amount of money on the case, which meant that they could hire extra attorneys; (2) multiple law firms had filed appearances for Janet; (3) if it were known that Dice was pregnant, alternative plans could have been made and "[o]ther people could have been brought up to speed"; (4) the case had been pending for a long time; (5) Dice was not so imperative to the case that it could not be tried without her; (6) Rosenfeld was an accomplished attorney and was acting as lead counsel; (7) there was no guarantee as to when Dice would return to work; and (8) delaying the case could require reopening discovery for purposes of revaluing John's various businesses. These were all valid reasons for denying Janet's mid-trial motion.

¶ 96    In support of her argument that the court abused its discretion, Janet asserts that "[t]he court had earlier designated Dice as one of two attorneys permitted to represent Janet." In a similar vein, Janet argues that, "[g]iven the trial court designated Dice as one of two permitted counsel for either side, the court should have allowed a short continuance here." To the extent that Janet means to imply that the court limited her to having only two attorneys present at trial, her statements are misleading. In fact, three attorneys appeared for Janet on each of the first six days of trial. The order restricting the parties to two attorneys each related to a pretrial conference, not to trial.

¶ 97    Janet also overstates her case when she dubs Dice "her chosen counsel." The record reflects that Rosenfeld examined the witnesses at trial and argued most of the objections. He also referred to himself in court as "the lead lawyer." Although Dice assisted Rosenfeld during trial and might very well have been Janet's "primary contact," Harger also assisted Rosenfeld at trial. Rosenfeld and Harger were competent to try the case, and there is no indication in the

record that they failed to adequately represent Janet's interests in Dice's absence. See *McMillen v. Carlinville Area Hospital*, 114 Ill. App. 3d 732, 739 (1983) ("Where more than one attorney is involved in a case, the absence of one of the attorneys at the time of trial does not necessarily mean that the cause must be continued [citations], especially where the attorney who tries the case has been involved from the inception of the case [citation], and where the attorney who tries the case is competent to try it.").

¶ 98      To the extent that Janet insinuates that the trial court's decision somehow violated federal law, her contention is forfeited due to her failure to cite authority or present a cogent argument. See *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("Mere contentions, without argument or citation to authority, do not merit consideration on appeal."). The trial court properly denied Janet's emergency motion to continue the trial.

¶ 99      E. Sanctions

¶ 100      In his separate appeal, Rosenfeld argues that the court "abused its discretion in ordering $50,000 in fees as an apparent sanction under [Illinois Supreme Court] Rule 137." John responds that the court properly awarded fees from Rosenfeld pursuant to Rule 137 as well as section 508(b) of the Act.

¶ 101      John's first motion for sanctions pertained to the conduct of Janet and her counsel in opposing John's motion for summary judgment. John noted that he supported his motion for summary judgment with six affidavits, along with comprehensive documentation accounting for his transactions with the trusts. John contended that neither of the affidavits that Janet submitted with her memorandum opposing summary judgment controverted the material allegations in his motion. He also emphasized the conspicuous absence of any affidavit from the trust expert she had retained. John maintained that Janet's memorandum opposing summary judgment was sanctionable due to its "numerous misstatements of the law and the evidence, baseless or false factual claims, and specious and irresponsible accusations of wrongdoing." According to John, at the hearing on the motion for summary judgment, Janet's counsel "doubled-down on the false and misleading factual claims and legal arguments." For all of these reasons, John requested sanctions against Janet and/or her counsel pursuant to Rule 137 and section 508(b) of the Act.

¶ 102      In her response to John's first motion for sanctions, Janet argued that her team of attorneys and her expert worked diligently to defend her against a claim involving more than 30 trusts and 4000 pages of exhibits. She insisted that she "was under no obligation to just 'go along' with John's agenda regarding the Trusts he established during the course of the litigation [*sic*] without Janet's active involvement." Janet denied misrepresenting the law, misrepresenting the evidence, or making any baseless claims in the course of opposing the motion for summary judgment.

¶ 103      John's second motion for sanctions addressed the discovery disputes between the parties. John noted that he had filed a motion to supervise discovery in which he complained of Janet's "unreasonable and harassing discovery demands." Such demands, he argued, included both requests for documents that he had already produced and requests for irrelevant documents. According to John, Janet's memorandum opposing his motion to supervise discovery included a spreadsheet purporting to identify outstanding discovery. John insisted that many of the items on that spreadsheet involved simple requests for updates, which he had been providing anyway, or documents that he had already informed her were unavailable. Most egregious,

John asserted, was Janet's contention that he failed to produce certain ledgers relating to his businesses. John emphasized that he had attached as an exhibit to his motion to supervise discovery a letter from his counsel confirming production of those ledgers. Notwithstanding John's counsel's letter, Rosenfeld repeatedly declared at a February 10, 2016, hearing that John had not produced the ledgers, even after John's counsel cited the relevant Bates numbers.[5] John noted that, on February 22, 2016, his counsel demonstrated to the court that he had previously produced those ledgers to Janet's counsel. For these reasons, John requested sanctions pursuant to Rule 137 and section 508(b) of the Act.

¶ 104       In her response to John's second motion for sanctions, Janet noted that on February 10, 2016, the court addressed multiple discovery motions and ultimately ordered John to tender some additional documents. Janet acknowledged that she had erroneously asserted that John failed to produce the ledgers, but she insisted that she had "no desire to waste the court's time." She claimed that the problem was that her forensic team had not properly catalogued the discovery that John tendered on November 2, 2015. Although she admitted that John's counsel had sent her counsel a letter asserting that the ledgers were produced previously, she noted that this letter did not specify *when* they were produced.

¶ 105       The trial court entertained argument from the attorneys with respect to John's two motions for sanctions. Apparently addressing the first motion for sanctions, John's counsel suggested that a proper sanction would be $151,370. He indicated that such amount represented "all the attorney's fees and costs relating to the reply to the motion for summary judgment, [Janet's] emergency motion [to continue the summary judgment hearing], *** the preparation for the hearing, and the hearing, as well as a motion for sanctions. And the motion for sanctions before the Court." John's counsel did not separately identify the attorney fees and costs at issue in the second motion for sanctions.

¶ 106       The court ruled on the motions for sanctions in the judgment for dissolution of marriage. The court indicated that, although it "did not agree with many of Janet's positions" with respect to John's summary judgment motion, and although "she did not present much evidence to support her positions," she had a right to investigate her claims. Nevertheless, the court explained, John produced substantial discovery, and Janet had the assistance of several accounting firms and law firms. Despite that "tremendous amount of support and advice," Janet proceeded to a hearing on her objections to John's motion for summary judgment "without any affidavit supporting her material factual allegations." According to the court, that hearing was unnecessary, and Janet "could not find one person to sign an affidavit to challenge John's creation of the irrevocable trusts or that they improperly diverted money from the marital estate."

¶ 107       Moreover, the court recalled, on February 10, 2016, it had spent an entire afternoon ascertaining which documents John had not produced. During that hearing, John's counsel insisted that he had produced some of the disputed items, even referencing the relevant Bates numbers. Rosenfeld nevertheless claimed that the accountants who were reviewing the discovery materials informed him that certain documents were missing. In the judgment for dissolution of marriage, the court explained that it had informed Rosenfeld that such an arrangement with the accountants would not "shield [Rosenfeld] from liability" if John's counsel could prove that he produced the documents. The court also noted that it had alerted

---

[5]Bates numbering is a method of indexing legal documents for easy identification and retrieval.

Rosenfeld that there could be a problem with his pleading, inasmuch as it had been asserted, under oath, that certain documents had not been produced. The court noted that John ultimately demonstrated that he had produced some of the documents that Rosenfeld claimed not to have.

¶ 108     Pursuant to all of these findings, the court entered sanctions against Rosenfeld, in the form of a $50,000 judgment in favor of John, for Rosenfeld's "unnecessary and unsupported litigation that increased the costs of litigation."

¶ 109     The trial court did not specify whether these sanctions were pursuant to Rule 137 or section 508(b) of the Act. It appears that the court could have had both provisions in mind. For example, the court's finding that Janet's arguments "were not legally supported" seems to invoke Rule 137, as does the court's comment that it warned Rosenfeld that there could "be a 'problem' with his pleading." The court's finding that the hearing on John's motion for summary judgment was "unnecessary" suggests that the court also contemplated sanctions pursuant to section 508(b) of the Act. See 750 ILCS 5/508(b) (West 2016) ("If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation.").

¶ 110     Rosenfeld interprets the court's order as a Rule 137 sanction. As there is a sufficient basis in the record to affirm the judgment against Rosenfeld pursuant to Rule 137, we need not address whether sanctions were also justified under section 508(b) of the Act.

¶ 111     Rule 137(a) provides, in relevant portion:

> "The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other document is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other document, including a reasonable attorney fee." Ill. S. Ct. R. 137(a) (eff. Jan. 1, 2018).

In evaluating the conduct of an attorney in light of this rule, "the court must determine what was reasonable at the time rather than engage in hindsight." *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074 (1995). We will not reverse the trial court's order imposing or denying sanctions unless the court abused its discretion, which occurs "only where no reasonable person would take the view adopted by it." *Fremarek*, 272 Ill. App. 3d at 1074. "When reviewing a decision on a motion for sanctions, the primary consideration is whether the decision was informed, was based on valid reasoning, and follows logically from the facts." *Deutsche Bank National Trust Co. v. Ivicic*, 2015 IL App (2d) 140970, ¶ 25.

¶ 112     We hold that the trial court did not abuse its discretion in sanctioning Rosenfeld. Janet's memorandum opposing summary judgment was replete with serious allegations of misconduct that were not supported by any evidence. For example, she asserted that "John's estate planning structure reads like a manual for manipulating the marital estate in contemplation of

divorce using standard and verified estate planning strategies." According to Janet, "[c]ommencing in 2005 and through the filing of the divorce, [she] was the unwilling and unsuspecting victim of an ongoing scheme at the hands of John." Not only was there no evidence of any scheme, Janet did not even contend that the marriage began its irretrievable breakdown until 2011. It defies common sense for her to argue that John schemed against her six years before the parties' marital problems even supposedly began.

¶ 113    Additionally, although Janet acknowledged signing documents relating to the trusts, she claimed that she did so only because of "John's misrepresentations regarding their true nature." She provided no evidence of misrepresentations—just allegations that he generally would tell her that the documents were "for the children," that there was "nothing to worry about," and that they were "for taxes" or "just business."

¶ 114    Moreover, Janet speculated that John would continue his scheme upon the entry of the divorce:

> "It is also worth noting that following the completion of the divorce proceedings, John, who presumably moved assets with a substantial potential for appreciation and/or income or dividend distribution out of the marital estate and into the Trusts for the sole purpose of setting aside these assets during the pendency of the divorce proceedings, will, through his unrestrained power to borrow money from the Trusts and his power to substitute assets, undoubtedly seek to reverse the initial transactions so to pull those assets back out of the Trusts for his own use."

There was no basis in the record for this assertion. John clearly did not have an "unrestrained power to borrow money" from the trusts, given that the trustees had to approve any loans in accordance with their fiduciary obligations. With respect to John's purported use of his power to substitute assets, Janet acknowledged elsewhere in her memorandum that she was "unable to ascertain the true extent of John's substitutions of properties" without the benefit of further discovery. In other words, she had no basis to allege that John would use his power of substitution to further any alleged scheme after the dissolution of the marriage.

¶ 115    In her memorandum opposing summary judgment, Janet also questioned the independence of some of the trustees, alleging, without any basis in the record, that "[t]hese individuals are influenced to do what John wishes or directs them to do as a result of their relationship." Referring to one particular transaction, Janet even suggested that "it is likely that John and Michael LaRocque may have conspired to commit income tax avoidance by characterizing compensation as a tax free gift."

¶ 116    Despite Janet's accusations of grave improprieties with respect to the trusts, as the trial court observed, "[s]he could not find one person to sign an affidavit to challenge John's creation of the irrevocable trusts or that they improperly diverted money from the marital estate." Rosenfeld signed the memorandum on Janet's behalf, thus putting his professional imprimatur on Janet's arguments. As noted above, to disturb the sanctions imposed, we would have to conclude that no reasonable person would adopt the trial court's viewpoint. In light of this highly deferential standard of review, we cannot say that the court abused its discretion in sanctioning Rosenfeld in connection with Janet's opposition to John's motion for summary judgment.

¶ 117    The same holds true with respect to Rosenfeld's pleadings regarding discovery. Rosenfeld inaccurately represented to the court, both orally and in writing, that John had not produced certain materials in discovery. Rosenfeld did this despite having been informed by opposing

counsel, both in a letter and in open court, that the documents had been produced. Rosenfeld discounts the whole situation as a mere mix-up due to Janet's accountant's failure to inventory the materials. Be that as it may, instead of working with opposing counsel to resolve the dispute in a professional manner, Rosenfeld doubled down on his claim that he had not received the documents. This wasted the court's time and opposing counsel's time. It also contributed to the toxic dynamic between the attorneys that continued throughout the trial. It is clear from the record that the court sanctioned Rosenfeld not just for a mistake, but for the way that he handled that mistake. We find no abuse of discretion.

¶ 118 At the very end of his brief, Rosenfeld complains about the amount of the sanctions, $50,000. Specifically, he asserts, "[t]he court gave no grounds for this random figure, and conducted no further hearing." According to Rosenfeld, "[n]ormally upon entertaining or granting a petition for fees as a sanction, a court will instruct a party to submit itemized billing on the issue." Noting that the court here failed to do so, he contends that the court's "random award of $50,000 is arbitrary at best," is excessive, and amounts to an abuse of discretion.

¶ 119 We deem this argument forfeited. The only authority that Rosenfeld cites in this portion of his brief is *Kellett v. Roberts*, 281 Ill. App. 3d 461 (1996), which he offers merely in support of the applicable standard of review. That case says nothing about requiring trial courts to instruct parties to submit itemized billing statements. *Kellett* did not even involve a challenge to an allegedly excessive Rule 137 sanction, as the relevant issue on appeal was whether the trial court had properly *denied* a motion for Rule 137 sanctions. *Kellett*, 281 Ill. App. 3d at 464. *Kellett*'s principal holding with respect to the issue of Rule 137 sanctions is also questionable law in light of *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 14, which clarified that a trial court is not required to offer any explanation if it decides to deny a motion for Rule 137 sanctions. Rosenfeld has failed to provide relevant authority supporting his contention that the amount of the judgment against him was arbitrary or excessive. The argument is forfeited.

¶ 120                                   III. CONCLUSION
¶ 121 For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

¶ 122 Affirmed.